Kelcie HERRON, Plaintiff–Appellant,

v.

Donna E. SHALALA,* Secretary of the United States Department of Health and Human Services, Defendant–Appellee.

No. 92–1544.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 16, 1993.

Decided March 21, 1994.

* Donna E. Shalala is substituted for her predecessor, Louis W. Sullivan, as Secretary of Health and Human Services. Fed.R.App.P. 43(c)(1).

Barry A. Schultz, Schultz & Winick, Chicago, IL (argued), for Kelcie Herron.

Susan Smith Ross (argued), Dept. of Health and Human Services, Region V, Office of Gen. Counsel, James G. Hoffnagle, Office of U.S. Atty., Chicago, IL, for Donna E. Shalala.

Before POSNER, Chief Judge, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Kelcie Herron appeals from the district court order affirming the denial of disability

benefits by the Secretary of Health and Human Services ("the Secretary"). Herron applied for benefits in 1987 and was denied both initially and upon reconsideration. After a hearing, the administrative law judge ("ALJ") also denied benefits. On review, the Appeals Council remanded the case to the ALJ to discuss the credibility of Herron's complaints of pain and to consider the effect of that pain on his ability to function. In addition, the ALJ was to obtain evidence from a vocational expert ("VE") regarding the types and number of jobs available in the national economy that Herron could perform. Upon rehearing, the ALJ again denied Herron's application, concluding that despite certain limitations on Herron's ability to work, there were significant jobs in the national economy that he could perform. Herron contests that conclusion.

## BACKGROUND

Herron suffers from lung disease. He worked for approximately 20 years as a punch press operator and as a group leader at a steel container manufacturing company before he became ill.

Herron testified that he suffered shortness of breath and constant chest and back pain, exacerbated when breathing, reaching, bending, lifting, and talking. He claims that his chest pain is aggravated by extreme temperatures, smoke, dust, and air conditioning. In addition, his fingers crimp so that he has difficulty picking up small objects. He takes Indomethacin[1] to relieve the pain but the medication makes him weak and drowsy for three hours thereafter. Herron normally naps during the day. Barbara Herron's testimony corroborated her husband's complaints. She stated that his chest often hurts, he has difficulty breathing, he lays down all the time, and he is no longer able to perform household tasks such as mowing the lawn.

Herron's physician, Dr. Antanas G. Razma, diagnosed Herron's illness as interstitial lung disease with mild dyspnea[2] upon exertion, and mild coughing. Although Herron could work, Dr. Razma concluded that exposure to the chemicals at Herron's workplace would worsen his condition. Two assessments of Herron's residual functional capacity ("RFC") found that he should avoid exposure to chemical fumes and excessive pulmonary irritants.

Dr. Julian Freeman, who testified as a medical expert, disagreed with Dr. Razma's diagnosis. He stated that Herron's pain was not medically compatible with an ordinary lung infection, blood clot or pleurisy but was more consistent with sarcoidosis or scleroderma.[3] At Herron's stage of the disease and with partial steroidal treatment, Dr. Freeman observed that people could usually function at the light exertional level as long as the work did not involve repeated fine manipulations with the hand and fingers.

---

1. Indomethacin is a nonsteroidal anti-inflammatory drug used to relieve pain, stiffness, and inflammation. Side effects include abdominal pain, nausea, heartburn, headache, dizziness, and an increased risk of peptic ulcer. AMERICAN MEDICAL ASSOCIATION ENCYCLOPEDIA OF MEDICINE 581 (Charles B. Clayman, M.D. ed., 1989) [hereinafter ENCYCLOPEDIA OF MEDICINE].

2. Interstitial pulmonary fibrosis is the scarring and thickening of the deep lung tissues, leading to shortness of breath, coughing, chest pains, and finger clubbing. ENCYCLOPEDIA OF MEDICINE, *supra*, at 599. The prognosis is poor, especially where the cause of the disease is linked to occupational exposure to mineral dusts and chemical fumes. *Id.* Dyspnea is the medical term for difficult or labored breathing. *Id.* at 383.

3. Based on Herron's medical history and the testimony at the hearing, Dr. Freeman summarized:

In terms of my medical impression ... what's being described is really compatible with two known medical diseases, primarily sarcoidosis, which is an infection of the lung of unknown etiology that can lead to shortness of breath and diffuse muscular skeletal pains including the type of finger/hand problem the claimant is describing, and also a group of diseases that fall into the general category of a variance of, of [sic] scleroderma ... In other words, involvement of the lungs with the problem of getting oxygen to the blood particularly at high exertion levels, and a problem of progressive loss of, of hand function. The diagnostic studies that have been performed by the claimant's physicians are not adequate to either make or deny the diagnosis.... However, the description the claimant is providing is, nonetheless, compatible with these diseases.

However, Dr. Freeman noted that the amount of pain experienced varies from one individual to another, and that Herron would have experienced an increase in pain after his treating physicians eliminated Prednisone.[4] Herron's treating physician changed his medication after he suffered side effects from the Prednisone.

After the first hearing, Dr. Freeman submitted an updated opinion. Because there was clinical evidence of "relatively early pulmonary hypertension[5]", he concluded that Herron should be limited to lifting 20 pounds occasionally, 10 pounds frequently, pushing or pulling 20 pounds, occasional climbing, and comparable limits on carrying.[6] Also, Herron could walk or stand up to six hours and had no other impairments regarding crouching, stooping or upper limb use. However, he would need a respirator to protect against exposure to airborne irritants. Finally, Dr. Freeman commented:

> While the general comments made about pulmonary fibrosis are reasonable medically, the results of the CO diffusion studies and ... [other] studies ... in the record indicate the lack of any major defect in oxygen delivery to the blood, and the lack of a reasonable basis to the exertional dyspnea, fatigue, weakness, etc., alleged due to underlying lung disease.... [T]he exertional levels attained in the previous exercise testing are inconsistent with the allegations of both pain and shortness of breath ... to the degree alleged.

At the second hearing, the ALJ asked the VE to describe light work[7] that could be performed by a hypothetical person of Herron's age, education, and work experience, with the same medical complaints and need to avoid polluted environments. The VE stated that such a person could work as a hand packager, light assembly worker, or security guard and that 40,000 such jobs existed in the Chicago area. Breathing difficulties, restricted arm movement, and limited hand use would significantly affect Herron's ability to perform the packaging and assembly jobs, and no positions existed if the VE considered Herron's inability to work in an air-conditioned environment or need to lie down for several hours each day.

The ALJ concluded that Herron possibly had sarcoidosis or scleroderma, as well as early pulmonary hypertension. These impairments, either individually or collectively, did not meet or equal any conditions in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1 (1990). Furthermore, Herron's complaints of pain were neither supported by the objective evidence and testimony nor disabling in nature. The ALJ rejected Herron's alleged inability to work in air-conditioned environments, and found Herron's statements about the need to lie down several hours unbelievable. He concluded that Herron has the residual functional capacity to perform light work in nonpolluted environments and that a significant number of jobs existed in the Chicago area according to the VE. Since Herron could perform these jobs, the ALJ held that Herron did not have a disability pursuant to the Social Security Act, 42 U.S.C. §§ 416(i), 423. The Appeals Council denied review, and the district court affirmed. We affirm in part and remand in part.

## DISCUSSION

■ Because the Appeals Council found no basis for further review, the ALJ's findings constitute the final decision of the Secretary. 20 C.F.R. § 404.981; *Jones v. Shalala,*

4. According to Dr. Freeman, Prednisone is the standard treatment for sarcoid and some of the scleroderma variants. It is a corticosteroid drug used to reduce inflammation and improve symptoms in a variety of disorders. ENCYCLOPEDIA OF MEDICINE, *supra,* at 813.

5. A disorder in which the blood pressure in the arteries supplying the lungs is abnormally high. One cause of pulmonary hypertension is interstitial pulmonary fibrosis. ENCYCLOPEDIA OF MEDICINE, *supra,* at 836–37.

6. During oral argument, it was established that even though Dr. Freeman's revised diagnosis did not mention scleroderma or sarcoidosis, he did not explicitly rescind his earlier determination.

7. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job in this category requires much walking or standing; if sitting, it involves some pushing and pulling of the arms or legs. 20 C.F.R. § 404.1567(b).

10 F.3d 522, 523 (7th Cir.1993). We will affirm the Secretary's decision if it is supported by substantial evidence. *Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir.1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. Railroad Retirement Bd.*, 10 F.3d 1306, 1310 (7th Cir.1993) (quoting *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). Although we review the entire record, we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the Secretary. *Jones*, 10 F.3d at 523; *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir.1989).

Herron argues that the Secretary failed to meet her burden of proving the existence of significant numbers of jobs that he could perform.[8] Specifically, Herron attacks the ALJ's failure to consider his alleged loss of fine motor control, to credit his sensitivity to air-conditioned environments, and to consider the side effects of his medication. Also, he claims that the ALJ should not have based his decision on the grid, that the hypothetical question to the VE was inadequate, and that the ALJ failed to consider his wife's testimony.

### A. Finger/Hand Dexterity

Herron testified during his first hearing that he had difficulty picking up or gripping small objects with his hands and that his fingers crimped. Although he was tested for arthritis, the results were negative. Dr. Freeman acknowledged that sarcoidosis and scleroderma could cause both inflammation or irritation of the joints inducing pain and an abnormal curvature of the fingers that would progressively worsen. In the ALJ's first decision, the ALJ noted Dr. Freeman's conclusion that Herron could perform "light or sedentary work not involving the *extensive* use of fine motor control." Specifically, Dr. Freeman stated that Herron would be able to work at the light exertional level "as long as the work didn't involve repeated use of the hands and fingers for fine motor use such as for example, typing, assembly—of repeated assembly of small parts, things of that sort." He also emphasized, however, that these limitations were based on his own conclusions and were not directly supported by the diagnoses in the medical record. Although the ALJ incorporated by reference the summary of the evidence from his first decision into the second determination, he failed to make any assessment of the medical evidence and testimony relating to Herron's hand impairment after the second hearing.

■ Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.1993); *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 392 (7th Cir.1992) (failure to discuss claimant's testimony, his wife's affidavits, or the reports of three doctors); *Look v. Heckler*, 775 F.2d 192, 195 (7th Cir.1985) (failure to discuss uncontradicted evidence consisting of claimant's and friend's testimonies as well as medical reports); *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir.1984) (failure to discuss subjective complaints of pain supported by medical statements). Although a written evaluation of each piece of evidence or testimony is not required, *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir.1985), neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion. *Id.* We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ "must articulate at some minimal level his analysis of the evidence." *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir.1988); *Orlando, 776 F.2d at 213. Here, the ALJ failed to provide any explanation for the rejection of Herron's sub-

8. A five-step inquiry outlined in the Social Security regulations determines disability status. 20 C.F.R. § 1520(a)–(f). The Secretary must find sequentially: (1) whether the claimant is currently employed; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing any work in the national economy. If a claimant reaches Step 5, the Secretary has the burden of proving that there are jobs in the national economy that the claimant can perform. *Pope*, 998 F.2d at 477.

jective complaints of pain in his hands and fingers.

■ Once the presence of a medically determinable physical or mental impairment is established that could reasonably be expected to produce the pain alleged, but the intensity or persistence of the pain is unsubstantiated by the medical record, the ALJ is obliged to examine and weigh all the evidence including observations by treating and examining physicians, third-party testimony, the claimant's testimony and daily activities, functional restrictions, pain medication taken, and aggravating or precipitating factors to evaluate how much the claimant's impairment affects his ability to work. 20 C.F.R. § 404.1529 (1993); *Pope*, 998 F.2d at 482, 485; *see also* Social Security Ruling 88–13, Titles II and XVI: Evaluation of Pain and Other Symptoms.

■ Admittedly, the objective medical evidence relevant to Herron's alleged hand impairment is very sparse. The medical tests for arthritis were negative although "ulnar deviation of the second digits bilaterally" was noted. In addition, the two RFC assessments completed in 1987 and 1988 stated that Herron had unlimited fingering capacity.[9] Yet, Herron's hand impairment is a symptom of sarcoidosis, and that diagnosis, given by Dr. Freeman and accepted by the ALJ, is supported by the medical evidence. Thus, the ALJ was not free to dismiss Herron's hand impairment without explaining why he reached that conclusion "in a manner sufficient to permit an informed review." *Pope*, 998 F.2d at 485; *Ray*, 843 F.2d at 1002.

A ruling that Herron was unable to work extensively with his hands would have had significant impact on the disability determination since according to the VE, the only employment available to Herron would then be the security guard position. Because of the ALJ's failure to consider the evidence relating to Herron's hand impairment, we are unable to evaluate and determine whether substantial evidence existed to support the ALJ's finding. Accordingly, we will remand this portion of the appeal to the ALJ to make additional findings.

### B. Air–Conditioned Environment

■ Herron also alleges that an air-conditioned environment causes him to cough and sneeze which increases his pain. The ALJ found that his assertion was without support in the record.[10]

■ The objective medical evidence establishes that a person suffering from lung disease like Herron may experience chest pain and coughing; it does not suggest, however, that Herron's chest pain is so debilitating that it prevents him from performing light work in air-conditioned environments. To support his claim, Herron points to this passage in the hearing transcript:

> ATTORNEY: The, the testimony that Mr. Herron gave concerning the increased pain in very hot temperatures or in cold temperatures or the problems he has with air conditioning, are, are those consistent—is that testimony consistent with a possible diagnosis of sarcoidosis or scleroderma?
>
> DR. FREEMAN: It's consistent with it but not directly supported. In other words, that type of problem isn't specific for that type of a disease and can be associated with many problems. But it isn't inconsistent with that.

Yet, from the doctor's response it is unclear whether the doctor is making a correlation

---

9. The accuracy of these RFCs, however, are at best questionable. In addition to finding that Herron has unlimited fingering capacity, the assessments also indicate that Herron has unlimited ability to lift, carry, walk, push, pull, and sit or stand for more than 6 hours each day. Thus, these findings are in conflict with Herron's testimony as well as with the medical assessments of Herron's treating physician, Dr. Razma, and the medical expert, Dr. Freeman.

10. In addition, the ALJ stated that "one would expect air conditioning to improve claimant's

condition by eliminating pollutants." That conclusion was inappropriate because an ALJ cannot make an independent medical finding. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 278, 116 L.Ed.2d 230 (1991); *Rousey v. Heckler*, 771 F.2d 1065 (7th Cir.1985). Ultimately, however, the ALJ did not include his medical opinion in the disability determination. He stated only that Herron's complaints of pain found no support in the objective medical evidence.

between an increase in pain and hot air, cold temperatures, or air conditioning. Furthermore, Herron undermines his own claim by stating that cold air affects his breathing only when it dips below 50 degrees.

"Although we cannot discredit a complaint of pain simply because objective medical evidence was not introduced to support the extent of the pain, neither are we required to give full credit to every statement of pain ..." *Pope*, 998 F.2d at 486. Because Herron offers no other evidence to support his allegations of aggravated pain in air-conditioned environments and he contradicted his own testimony, the ALJ's finding on this issue is not patently wrong. *Id.* at 487.

### C. Side Effects of Herron's Medication

Herron contends that the ALJ failed to articulate a reason for rejecting all of the evidence relating to the debilitating side effects of his medication. Herron testified that this medication makes him feel drugged, and causes drowsiness.

The only evidence in the record discussing side effects is a statement by Dr. Freeman in which he comments that "Indocin ... can cause drowsiness, but this is a highly idiosyncratic (individual reaction) problem, not common and hardly universal." In addition, Herron testified that he needed to lie down approximately six hours a day because of the medication. His daily activities are limited to reading, watching TV, writing computer programs, and an occasional trip to the store to buy a loaf of bread. He does not do any household chores or any of the "big shopping." During the first hearing, Herron also stated that he hardly drove anymore and when he did, he drove to his father's house. At the second hearing, he said that his brother drove him when he visited his father. The V.E confirmed that a person whose mental alertness was diminished by medication would not be able to perform the jobs of security guard, light assembly worker, or hand packager.

The ALJ is not required to make specific findings concerning the side effects of prescription drugs on the claimant's ability to work. *Nelson v. Secretary of Health and Human Services*, 770 F.2d 682, 685 (7th Cir. 1985). Instead, such an argument will be interpreted as asserting that the ALJ's decision is not supported by substantial evidence. *Id.* Here, the ALJ did not specifically address Herron's claim that his medication incapacitated him; rather, he doubted Herron's credibility generally based on "confusing and conflicting answers" Herron gave to several questions. These inconsistencies included: (1) Herron's conflicting statements that he needed to lie down six hours after taking his medication, but later stating that he needed only three hours of rest; (2) Herron's testimony that he experienced chronic pain but that there were times when he did not need his medication; (3) Herron's medical record that showed he had not been treated between December 28, 1988 and February 26, 1990; and (4) Herron's assertions that he could not work in an air-conditioned environment.

Since the ALJ is in the best position to observe witnesses, we usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong. *Wolfe v. Shalala*, 997 F.2d 321, 326 (7th Cir.1993); *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir.1993). Oftentimes, a credibility determination involves inarticulable elements that "leave no trace that can be discerned in this or any other transcript." *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 541 (7th Cir.1992) (quoting *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986)). However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision. *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *Dray*, 10 F.3d at 1314.

Herron stated that he needed to lie down six hours a day and that he normally takes a three hour nap around 1 p.m., rising around 6 p.m. The ALJ seemed to consider lying down and napping as the same activity and therefore assumed that Herron was offering contradictory testimony. However, lying down and napping are not synonymous with each other, and therefore this testimony

does not support the ALJ's credibility determination.

Likewise, we do not find that the taking of medication as Herron needs it is necessarily inconsistent with his claim of chronic pain. Herron never stated that there were some days when he failed to take any medication. In fact, the record establishes that Herron takes at least three pills per day. He testified, however, that sometimes the medication is not as effective, and then he takes up to six pills per day. It is quite possible that the amount of pain Herron experiences varies daily. Yet, the fluctuation in the amount of medication taken does not suggest that Herron does not suffer from constant pain. Consequently, we conclude that the ALJ based his finding on an incorrect inference.

The ALJ also determined that Herron was not credible because he had not been treated since the date of the first hearing, a period of fourteen months. The ALJ came to that conclusion because Herron did not submit any new medical records at the second hearing. Not only do we question the relevancy of Herron's failure to show that he continued to seek medical treatment,[11] we also cannot find any basis in the record to support the ALJ's finding. Nor do we believe that it can be reasonably inferred that the failure to submit medical reports establishes that Herron did not receive any medical treatment during this period.

The only remaining support for the ALJ's credibility determination is his finding that Herron's assertions that he could not work in an air-conditioned environment were not credible. To affirm the ALJ's conclusion, we would need to assume that Herron's lack of credibility regarding the air conditioning issue reflects on the credibility of his entire testimony. We have already concluded, however, that Herron's air conditioning claim was not viable because of the questionable existence of objective medical evidence to support such a claim and Herron's contradictory statement. The ALJ did not dismiss the air conditioning claim based upon some subjective factor such as Herron's demeanor during the hearing. In fact, the ALJ's entire discussion of Herron's credibility revolved exclusively around the allegedly conflicting answers Herron provided. Because we have concluded that the inconsistencies in Herron's testimony do not exist, and the ALJ has not provided us with any other reason for rejecting Herron's testimony, we are left without a basis to uphold the ALJ's credibility determination. Consequently, Herron's side effects claim, meagerly supported by Dr. Freeman's comment and Herron's testimony, remains uncontested. Nonetheless, we find it unnecessary to reverse the ALJ's credibility finding at this point. Instead, we will remand the issue to the ALJ so that he may better articulate the grounds for his decision since meaningful appellate review at this juncture is impossible. *See Thomas v. Sullivan*, 801 F.Supp. 65, 71 (N.D.Ill.1992).

### D. Use of the Grid

■ Next, Herron argues that because of his severe nonexertional impairments, the ALJ should not have relied on the grid to determine whether enough jobs existed in the national economy which Herron could perform.[12] The use of the grid is inappropriate where the claimant's nonexertional impairments are so severe as to limit the range of work he can perform. *Allen v. Sullivan*, 977 F.2d 385, 389 (7th Cir.1992). In such a case, a determination of disability is made

11. Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits. *DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir.1989); *but see Caldarulo v. Bowen*, 857 F.2d 410, 413 (7th Cir.1988) (failure to seek medical attention and low dosage use of pain medication cast doubt upon the seriousness of claimant's ailments). *Cf. Thompson v. Sullivan*, 987 F.2d 1482, 1489–90 (10th Cir.1993) (case remanded where claimant failed to pursue medical treatment because ALJ did not consider whether medical treatment was prescribed, was refused by claimant, would restore the claimant's ability to work, or any other justifiable excuse for the claimant's failure to obtain treatment).

12. Herron's complaints of pain, drowsiness, finger immobility and sensitivity to environmental conditions such as air conditioning, extreme temperatures, smoke and dust are all considered nonexertional impairments. *See* Social Security Ruling 83–14, Titles II and XVI: Capability to Do Other Work—The Medical–Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments.

through the "testimony of vocational experts who can indicate what work, if any, the claimant is capable of performing." *Nelson,* 770 F.2d at 684.

However, in this case, the ALJ did not rely on the grid to establish Herron's disability status. Instead, he considered the VE's testimony and found that 40,000 jobs existed in unpolluted environments within the Chicago area which Herron could perform.

### E. Hypothetical Question

 The hypothetical question posed by the ALJ to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record. *Cass v. Shalala,* 8 F.3d 552, 556 (7th Cir.1993); *Ehrhart,* 969 F.2d at 540. However, the question need not take into consideration every detail of the claimant's impairments especially if the record demonstrates that the VE reviewed all the evidence prior to the hearing. *Cass,* 8 F.3d at 556; *Ehrhart,* 969 F.2d at 540; *but see Allen,* 977 F.2d at 390.

 In *Cass,* the claimant argued that the hypothetical question excluded some of her nonexertional impairments. Because the VE reviewed the medical reports before giving his assessment, the court held that "the VE's testimony constitute[d] substantial evidence ... despite any omissions in the hypothetical." *Cass,* 8 F.3d at 556; *see also Jones,* 10 F.3d at 525.

Similarly, we find no error here. Even though the ALJ framed his question without referring to all of Herron's complaints (drowsiness, finger immobility, sensitivity to air conditioning), the VE testified that he had reviewed the medical record before the hearing. Moreover, Herron's attorney expanded the record by posing additional hypotheticals to the VE that included Herron's other nonexertional impairments.

### F. Testimony of Barbara Herron

 Finally, Herron contends that the ALJ's decision should be reversed because the ALJ did not articulate any reason for rejecting the testimony of his wife. However, as in *Carlson v. Shalala,* 999 F.2d 180,

181 (7th Cir.1993), the ALJ addressed the issues raised by Herron's wife in relation to his testimony. Thus, the ALJ did not err in failing to mention reasons for rejecting Mrs. Herron's testimony.

### CONCLUSION

When the ALJ fails to mention an entire line of evidence in his decision, we are unable to conduct a meaningful review because we cannot establish if substantial evidence supported the denial of benefits. Consequently, we VACATE the district court's judgment and REMAND to the ALJ so that he may consider the objective medical evidence and Herron's testimony relating to his finger/hand dexterity problem.