101 F.3d 110
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Sharon L. NELSON, Plaintiff-Appellant,
v.
Shirley S. CHATER, Defendant-Appellee.
 No. 96-1882.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 1, 1996.
Decided Nov. 8, 1996.
 
 Before CUMMINGS, COFFEY and EVANS, Circuit Judges.
 
 ORDER
 
 1
 Sharon Nelson ("Plaintiff") challenges the denial of her application for disability benefits (Supplemental Security Income, "SSI") as provided under the Social Security Act, 42 U.S.C. § 1381 et seq. ("the Act.") After a hearing, an administrative law judge ("ALJ") found that Plaintiff's allegations of pain, though consistent with a Somatoform Disorder, were not so severe as to render Plaintiff disabled within the meaning of the Act, and thus, that Plaintiff was not entitled to SSI. The Appeals Council denied further administrative review, and the magistrate judge[1] entered judgment denying Plaintiff disability benefits because the ALJ's decision was supported by substantial evidence. On appeal, Plaintiff urges this court to again review whether the ALJ's decision is supported by substantial evidence.
 
 I. BACKGROUND
 A. Medical History
 
 2
 In her SSI application[2], Plaintiff detailed a history of numerous visits to physicians' offices seeking relief for pain and for panic or anxiety attacks. Prior to filing her SSI application, Plaintiff was diagnosed with left shoulder tendinitis, left lateral epicondylitis, possible tendinitis of the left knee, and muscle spasms, (Pl.'s Br. at 6) (R. at 156.) Yet, several of the clinical tests performed on Plaintiff indicated normal (or near normal) results. In other words, no specific physical problem or disease was found to be the cause of Plaintiff's multiple symptoms of pain. After several months of treatment, Dr. Owens, her rheumatologist, reported her uncertainty in identifying the etiology (causation) of Plaintiff's pain in her left leg and knee. (R. at 224.) Plaintiff was subsequently referred to a pain clinic.
 
 
 3
 After evaluating Plaintiff's medical history and clinical test results, Dr. Park, a pain clinic specialist who Plaintiff visited in February of 1991, confirmed that Plaintiff suffered a nerve injury in her right leg and that such injury probably correlated with Plaintiff's numbness in that leg. (R. at 164, 166-68.) And, although he noted that the nature of Plaintiff's pain was uncertain, he diagnosed her with probable chronic mechanically-oriented periarthritis of the left knee, probable secondary mechanical strain, and manic-depressive personality disorder. (R. at 165.) He administered a soft-tissue injection which resulted in temporary relief in Plaintiff's leg followed by what Plaintiff described as a "flare-up" or recurrence of even more severe pain. (R. at 227.)
 
 
 4
 Plaintiff also sought help from a psychologist, Dr. Hague, beginning in approximately February of 1988. In addition to administering Lithium treatment (apparently to control her anxiety and mental disorders), Dr. Hague indicated that although Plaintiff complained of financial problems, she independently cared for herself and for her children. (R. at 237-52.)
 
 
 5
 Shortly after applying for SSI, Plaintiff continued to seek relief for pain. She again visited her rheumatologist (Dr. Owens) in April of 1992, complaining of pain in her left hip, knee, shoulder, and elbow. On that occasion, Dr. Owens noted that she had not seen Plaintiff since April of 1990 (two years before Plaintiff filed her SSI application) and that Plaintiff's visit was apparently related to her pursuit of Social Security benefits. (R. at 228.) Dr. Owens indicated that although Plaintiff complained of pain in her shoulder, there was no physical evidence of tenderness in the joints and that she had good range of motion without pain in her shoulder and elbow. Id. Dr. Owens prescribed "Tylenol 3" but indicated that she was at a loss "to know what might really be helpful to [Plaintiff] over the long term." (R. at 228.) Although he suggested (but did not prescribe) that Plaintiff return to Dr. Park at the Pain Clinic, Dr. Owens noted that Plaintiff was "fairly resistant" to that option due to a "paradoxical reaction" to an injection she previously received from Dr. Park. Id.
 
 
 6
 Plaintiff also returned to Dr. Hague's office after she applied for SSI benefits for what his notes indicated were "routine" medication evaluations. On one of the visits, he indicated that Plaintiff was doing fairly well and was planning a trip to Kentucky to see relatives. Later, in October of 1992, he completed a mental residual functional capacity assessment ("RFCA") regarding Plaintiff. The RFCA form stated that its purpose was "to determine this individual's ability to do work-related activities on a day-to-day basis in a regular work setting." (R. at 285.) According to Dr. Hague, Plaintiff suffered from "rapidly cycling moods and Panic Disorder." (R. at 285.) Due to these problems he indicated that Plaintiff's ability to deal with the public, to relate to co-workers, to interact with supervisors, to deal with work stresses, to function independently, and to maintain attention or concentration, was "Poor or None." Id. Furthermore, he indicated that Plaintiff was incapable of understanding, remembering, or carrying out either complex or simple instructions and that Plaintiff was emotionally unstable and unreliable. Id. The only positive evaluations given by Dr. Hague were that Plaintiff had "Good" ability to follow work rules, to judge, and to maintain personal appearance. Id.
 
 
 7
 B. Hearing Testimony Bearing on Plaintiff's Allegations
 
 
 8
 Plaintiff testified that she suffers from "panic attacks" 20-25 times a month, during which she feels dizzy, shaky, nauseous, and feels she just has to get away from people. (R. at 295-299.) She also stated she does not socialize much, but that she has played "cribbage" three out of five times that she was scheduled to play (she canceled twice due to having a "bad day"). She also testified that she no longer traveled, although she admitted to going to Kentucky to visit some relatives, once in 1991 and once in 1992. (R. at 325.) She explained that she was a passenger on those trips because she refuses to drive long distances, and in fact, only drives within city limits to her daughter's house or to the grocery store. (R. at 321.) She further noted that because of her condition she has to lean on the grocery cart and go shopping at "off" hours to avoid crowds. (R. at 300.) She also testified that her right leg constantly numbs; but she admitted that this numbness does not impair her ability to walk. (R. at 314.) On the other hand, she testified that pain prevents her from walking more than a half block, that she is unable to sit for more than thirty minutes without needing to move around to allay stiffness and discomfort, and that she had difficulty climbing stairs. (R. at 302, 312, 323-24.) Nevertheless, she admitted to doing light housework, for up to forty-five minutes at a time without a break, including dusting, mopping, watering plants, and laundry (which is located in her basement and thus requires climbing stairs). Moreover, she admitting to cooking meals for her family, although to cook she leans on the counter and elevates her foot on a stool during the process. (R. at 316-17.)
 
 
 9
 Dr. Hauer, a medical expert ("ME"), also testified at the hearing and gave an opinion of Plaintiff's residual functional capacity ("RFC") based on his review of Plaintiff's medical history and Plaintiff's testimony. Contrary to the findings given in Dr. Hague's RFCA, the ME testified that Plaintiff had "Good" ability to deal with co-workers, supervisors, and the public, and to follow simple and complex work instructions. (R. at 331-34.) The only point he agreed with Dr. Hague with was that Plaintiff had "Good" ability to use judgment. (R. at 330-31.) He rated Plaintiff's ability to deal with work stress as "Fair," meaning seriously limited but not totally precluded. Further, the ME testified that while Plaintiff currently had "Poor" ability to complete a typical work week, after a transition period, she would attain a "Fair" ability in the long run. (R. at 334.) When asked by counsel how long this transition period would take, he conceded that it could take up to a year. (R. at 336.)
 
 
 10
 William Dingess, a vocational expert ("VE"), also testified at the hearing. The ALJ asked the VE to state, hypothetically, whether jobs existed in the national economy for an individual possessing the residual functional capacity attributed to Plaintiff by the ME and, alternatively, by Dr. Hague. The VE responded that there were a significant number of jobs available in Wisconsin for an individual possessing the RFC attributed to Plaintiff by the ME (hypo. # 1), including the following categories and number of jobs: light office cleaner, 44,830; food preparation workers, 20,100; hand-packers and packagers, 19,240; and machine tenders, 37,990. (R. at 339.) Next, assuming a restriction of exertionally-light work (hypo. # 2), the VE responded that the previous listed categories of jobs would still be available but that 75% of the office cleaner jobs and the machine tenders jobs would be eliminated and that 25% of the food preparation jobs would be eliminated. Id. Third, the VE considered an individual possessing the same characteristics as assumed in the first hypothetical (without the light exertional limit) but having a "Poor" rather than "Fair" ability to complete a normal work week without interruption from psychologically based symptoms (hypo. # 3) (R. at 340). The VE responded that there would still be jobs available to such an individual assuming the individual undergoes an adjustment period starting with a few hours and building forward. (R. at 340-41.) For instance, the VE noted that such an individual could seek part-time employment as a food preparation worker, janitor, or cleaner. Id. Concerning the available number of such jobs, the VE acknowledged "there would be some diminishment, but for industries hiring those types of workers, they readily have part-time work available." Id. Finally, assuming the symptoms and limitations expressed by Plaintiff and by Dr. Hague in his RFCA, the VE testified that no jobs existed for such an individual (hypo. # 4) (R. at 341-42.)
 
 C. The ALJ's decision
 
 11
 After acknowledging Plaintiff's medical history of mental impairments (consistent with a Somatoform Disorder), the ALJ pointed out 1) that Plaintiff maintained near normal daily living activities, 2) that Plaintiff takes Tylenol # 3 only "as needed" 3) that Plaintiff refused pain clinic treatment, 4) that her physicians have been "puzzled over the etiology of her symptoms," and 5) that, although Plaintiff stated she avoid people, she is "overly-involved with her children's problems" and she has been able to travel and to take care of her grandchildren. Id.at 80. Next, the ALJ credited the findings of the ME that Plaintiff has only a slight restriction in her activities of daily living:
 
 
 12
 She can see to her own needs; she had moderate difficulties in maintianing social functioning, noting that while the claimant has limited contacts, the quality of the contcts she has do not present any significant problems. She has seldom had deficiencies of concentration, or persistence, or pace.
 
 
 13
 Id. The ALJ further noted that the VE testified that "a significant number of jobs in the economy" were available for an individual with the RFC attribuged to Plaintiff by the ME. Id. at 81. Further, the ALJ noted that there were still a significant number of jobs available to Plaintiff, even if a light exertional limit was imposed: "The claimant's anxiety related and Somatoform disorders are not so disabling as to prevent the claimant from engaging in all work related activity. The undersigned finds that claimant's alleged pain is not supported by substnatial medical evidence and is in fact cntradicted by clinical laboratory findings, as discussed herein." Id.at 81. In separately numbered paragraphs, the ALJ then restated much of what was said in the body of his opinion, including that "[t]he claimant's subjective complaints are not fully credible to the extent they are not supported by the ojective medical and other third party evidence of record," and that "[t]here are no exertional limitations." See id. at 82 pp 3-4. In paragraph ten, the ALJ listed the potential jobs Plaintiff could perform which corresponded to the first hypothetical put to the VE (based on Dr. Hauer's RFCA of Plaintiff that did not include a work-week restriction). The ALJ concluded that Plaintiff was not disabled within the meaning of the Act (R. at 80-81.)
 
 II. ANLAYSIS
 
 14
 A. Consideration of Plaintiff's Somatoform Disorder
 
 
 15
 The record reveals that Plaintiff appears to suffer from a Somatoform Disorder, which, as described in regulations, is characterized by alleged physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms. See 20 C.F.R. Pt. 220, App. 1 § 12.07. Merely being diagnosed with a Somatoform Disorder does not automatically entitled one to SSI benefits. Rather, an applicant suffering from a Somatoform Disorder must show that her Somatoform Disorder is sufficiently severe to render her effectively "disabled" and thus entitled to SSI. See 42 U.S.C. § 423(d)(2)(A) (noting that the alleged impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy"); See Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir.1996); Jones v. Shalala, 10 F.3d 522, 524 (7th Cir.1993). Although the regulations[3] appear to require Plaintiff to show a marked restriction in ability to perform daily living, social, and work functions, the burden is on the Commissioner to show that Plaintiff (despite her Somatoform Disorder) retains the RFC to perform jobs available in the national economy. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir.1994) (noting that with respect to the familiar five-step inquiry outlined int he regulations to determine disability status, the government bears the burden of proving the last step, i.e. that there are jobs existing in the national economy that the claimant can perform, despite having a severe impairment). Since the ALJ found that jobs existed in the national economcy that Plaintiff could perform, and therefore that Plaintiff was not disabled within the meaning of the Act, the issue before this court is limited to determining whether this finding is supported by substantial evidence. Luna v. Shalala, 22 F.3d 687, 689 (7th Cir.1994). In conducting this review, we may not re-evaluate the facts, re-weigh the evidence, or substitute this court's judgment for that of the ALJ. Id.
 
 
 16
 Rather than contending that "substantial evidence" did not support the ALJ's finding that Plaintiff's Somatoform Disorder was not sufficiently severe, Plaintiff first argues that the ALJ failed to consider her Somatoform Disorder at all. The Commissioner attempts to show that the ALJ did consider the effect of Plaintiff's Somatoform Disorder by including a light exertional limit on Plaintiff's ability to work. The Commissioner points to the ALJ's statements that "[e]ven imposing a 'light' exertional limitation, as an additional restriction a good percentage of said jobs still exist," and, that "the claimant has the residual functional capacity to perform at least light work." (R. at 77, 81.) In reply, Plaintiff counters that paragraph four of the ALJ's numbered findings states that "[t]here are no exertional limitations." (R. at 82.) This apparent inconsistency (which relates to the ALJ's assessment of the severity of Plaintiff's Somatoform Disorder), though perhaps intriguing, is a red herring. The ALJ clearly states in his findings that although the Plaintiff suffers no disabling physical impairment, "she has a diagnosed anxiety related disorder and Somatoform disorder." (R. at 81.) The relevant issue, that we now turn to, is whether substantial evidence supports the ALJ's decision that Plaintiff's Somatoform disorder was not so severe as to render Plaintiff disabled.
 
 
 17
 B. Conflicting Medical Opinions on Plaintiff's Residual Functional Capacity
 
 
 18
 In determining the effect of Plaintiff's Somatoform Disorder on her ability to work, the ALJ considered the conflicting RFCA given by the ME (Dr. Hauer) and Plaintiff's psychologist (Dr. Hague). Although the ALJ cannot substitute his opinion for the physicians' opinions of Plaintiff's condition, see Scivally v. Sullivan, 966 F.2d 1070, 1076-77 (7th Cir.1992), the ALJ is free to accept either opinion as long as the officer's factual finding is supported by substantial evidence. Dray v. Railroad Retirement Board, 10 F.3d 1306, 1310 (7th Cir.1993):
 
 
 19
 In the case of dueling doctors, it remains the province of the hearing officer to decide whom to believe--a treating physician whose experience and knowledge about the case may (or may not) be relevant to understanding the claimant's condition, or a consulting specialist who may bring expertise and knowledge about similar cases. At all events, "resolution of evidentiary conflicts lies within the exclusive domain of" the hearing officer so long as those factual findings are supported by substantial evidence.
 
 
 20
 Id. Nevertheless, although it need not discuss all the evidence or testimony, the ALJ cannot, without explanation, discount entire lines of reasoning or discount an uncontradicted, dispositive medical opinion. Herron, 19 F.3d at 333. But medical evidence, even that from a treating physician, "may be discounted if it is internally inconsistent or inconsistent with other evidence" in the record. See Knight v. Chater, 55 F.3d 309, 314 (7th Cir.1995).
 
 
 21
 Although Plaintiff argues that the ALJ substituted its own opinion regarding Plaintiff's RFC, the record shows that the ALJ merely chose to believe the ME's testimony rather than the RFCA submitted by Dr. Hague. Indeed, the ALJ's report indicates that it relied on the VE's testimony regarding the number of jobs available to an individual in the hypothetical situation (hypo. # 1) that was based on the RFCA attributed to Plaintiff by Dr. Hauer. It follows, therefore, that it must have rejected Dr. Hague's opinion, which, if accepted, supported a finding of no available jobs according to the VE. We recognize that the ALJ must be sufficiently clear in rejecting medical testimony. See Dray, 10 F.3d at 1311 (stating that "the hearing officer must not only offer some principled basis explaining why one account [of conflicting testimony] is worthier than another, but also explain with particularity the basis of the decision"). However, a remand is not required if in discounting Dr. Hague's opinion, the ALJ "articulate[s] at some minimal level his analysis of the evidence.' " Herron, 19 F.3d at 333 (quoting Ray v. Bowen, 843 F.2d 998, 1002 (7th Cir.1988)).
 
 
 22
 Here, the structure of the ALJ's detailed report implicitly shows that the ALJ considered but rejected Dr. Hague's RFCA due primarily to the lack of clinical findings to support it and because Plaintiff participated in "near normal" activities. (R. at 79-80.) First, the ALJ clearly acknowledged that Dr. Hague evaluated Plaintiff's ability to perform most work functions as "Poor or None." (R. at 79.) Next, he stated that "there is no objective medical evidence to substantiate [Plaintiff's] complaints," noting that "the medical evidence fails to substantiate that the claimant has a severe disabling physical impairment," and in regard to a mental impairment, that Plaintiff "has near normal activities of daily living." (R. at 70-80) (emphasis). Moreover, the ALJ noted that the Plaintiff has refused treatment at the pain clinic. Also, despite Plaintiff's claim that she could not travel, the ALJ noted Plaintiff traveled to Kentucky and that she takes care of her grandchildren. (R. at 80.) Finally, the ALJ stated that the ME's testimony was contrary to Plaintiff's allegations and to Dr. Hague's REFCA. After this thorough summarization of the record, the ALJ concluded that the Plaintiff was not disabled. We thus reject Plaintiff's claim (made at oral argument) that the ALJ's discussion of the record was "short-shrift."
 
 
 23
 In addition to the ALJ's implicit rejection of Dr. Hague's RFCA, the record as a whole supports the ALJ's decision to discount Dr. Hague's opinion. Most notably, Dr. Hague's RFCA of Plaintiff is inconsistent with his own clinical findings made during the relevant period. For instance, after Plaintiff's last visit with Dr. Hague, he reported no mental abnormalities, and, that Plaintiff was feeling well enough to travel to Kentucky to visit her friends and relatives. (R. at 251-52.). Moreover, Dr. Hague's assessment was also inconsistent with the opinions of two addtional psychologists who opined that Plaintiff's mental condition did not significantly limit her ability to perform basic work activities. (R. at 101-05, 108-12, 252-62.)
 
 
 24
 Based on the lack of clinical findings to support Dr. Hague's assessment and based on the apparent inconsistency between his assessment and Plaintiff's nearly normal activities, the ALJ properly discredited Dr. Hague's assessment of Plaintiff's residual functional capacity. Moreover, the ALJ met the minimal articulation standard because "we can 'track the ALJ's reasoning and be assured that the ALJ considered the important evidence." Diaz v. Chater, 55 F.3d 300, 308 (7th Cir.1995) (quoting Green v. Shalala, 51 F.3d 96, 101 (7th Cir.1995)).
 
 
 25
 C. Plaintiff's Subjective Allegations of Pain
 
 
 26
 In addition to discounting Dr. Hague's opinion, the ALJ also rejected Plaintiff's subjective allegations of pain: "The undersigned [ALJ] finds the claimant's alleged pain is not supported by substantial medical evidence and is in fact contradicted by clinical and laboratory findings...." (R. at 81.) Plaintiff argues that the ALJ's negative credibility finding concerning her pain allegations should not be accorded deference by this court. We cannot disturb the ALJ's finding that Plaintiff's subjective pain allegations were not credible, unless the ALJ's findings are patently wrong. Rucker v. Chater, 92 F.3d 492, 495 (1996). And while this court "cannot discredit a complaint of pain simply because a plaintiff did not introduce objective medical evidence to support the extent of the pain," we are " 'neither required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work.' " Id. at 496 (citation omitted). This court, in Pope v. Shalala, 998 F.2d 473, 485-86 (7th Cir.1993), developed an extensive framework for reviewing subjective allegations of pain that are unsupported by objective, medical evidence. In sum, Pope advises the following analysis:
 
 
 27
 If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of this or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors taht must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.
 
 
 28
 Luna, 22 F.3d at 691 (citing Pope, 998 F.2d at 485-86)).
 
 
 29
 The ALJ in this case considered Plaintiff's pain in light of most of the above criteria: He solicited the details of Plaintiff's daily activities, which included regular house cleaning (dusting, mopping, laundry, and cooking), shopping, attending her son's athletic events, helping her son with homework, visiting with friends and playing cribbage, working crossword puzzles, collecting ink pens, reading, and writing letters. (R. at 80.) The ALJ also noted the lack of clinical findings and medical opinions supporting Plaintiff's claims. Plaintiff therefore argues that the ALJ improperly discounted her pain allegations merely because her doctors could not identify its "physical etiology" or cause. Rather than showing an inconsistency, Plaintiff contends that the medical record demonstrates that Plaintiff's pain is consistent with a Somatoform Disorder. But this reasoning does not get Plaintiff very far because she still cannot point to any medical evidence supporting her allegations of the severity of her Somatoform-related pain. See Herron, 19 F.3d at 334 (explaining that once the presence of a medically determinable physical or mental impairment is established that could reasonably be expected to produce the pain alleged, but the intensity or persistence is unsubstantiated by the medical record, then the ALJ is obliged to examine the factors identified in Pope ). Indeed, the record contains some contrary evidence, for instance, in the form of medical records showing that despite Plaintiff's allegations of pain, she had full range of motion and her joints did not show any evidence of tenderness. (R. at 228.). Additionally, the ALJ noted that Plaintiff's allegations of pain appeared inconsistent with her minimal reliance on pain medication and her refusal to seek treatment at the pain clinic. Reliance on this latter factor may be misplaced since it has not been shown that treatment at the pain clinic was prescribed or that it would have eliminated her disability, see DeFrancesco v. Bowen, 867 F.2d 1040, 1043 (7th Cir.1989) ("[I]f the claimant has inexcusably refused to follow prescribed medical treatment that would eliminate his total disability, then he isn't totally disabled.")). Still, it appears that the ALJ substantially considered the factors required by Pope. Under these circumstances, it appears that the ALJ was not patently wrong to discount Plaintiff's testimony. See Herron, 19 F.3d at 335 (stating that the court will not upset ALJ's credibility determinations on appeal unless they are "patently wrong" because the ALJ is "in the best position to observe witnesses"). Thus, this does not appear to be a case where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." Sarchet, 78 F.3d at 306.
 
 
 30
 D. ALJ's Refusal to Account for Work-Week Limitation in Reporting Available Jobs
 
 
 31
 Although there appears to be substantial evidence to support the ALJ's decision that Plaintiff's Somatoform Disorder is not so severe as to render Plaintiff disabled within the meaning of the Act, the ALJ's finding concerning the number of available jobs for Plaintiff failed to account for the fact that both the ME and Dr. Hague opined that Plaintiff's present ability to work a normal work week was "Poor to None." The ME opined that Plaintiff could obtain a "Fair" ability to complete a normal work week, only after a transitional period, acknowledged to be, perhaps, a year long. When stating the number of available jobs existing for someone like the Plaintiff, the ALJ relied upon the VE's figures that corresponded to the first hypothetical which did not account for the work-week limitation. The Commissioner contends that this misstatement or omission in the ALJ's report is without consequence, pointing out that "[n]o princple of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion." (Def.'s Br. at 32 n. 8) (citing Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir.1989)). We may remand, however, if an omission demonstrates the existence of an inadequate and illogical bridge between the evidence (the uncontradicted work-week limitation) and the result (the number of existing jobs reported by the ALJ to be available to Plaintiff). See Sarchet, 78 F.3d at 306. Notably, the VE also testified that even with a work-week limitation that a substantial number of jobs still would exist in the form of part-time employment in the job categories previously mentioned. (R. at 340-41.) Hence, viewing the record as a whole, we conclude that a remand is unnecessary because substantial evidence exists (in the Administrative Record though not in the ALJ's decision itself) supporting the ALJ's decision that Plaintiff could still perform a significant number of jobs existing in the national economy. According, we AFFIRM the decision of the district court finding that substantial evidence supports the ALJ's decision that Plaintiff is not disabled within the meaning of the Act.
 
 
 
 [1]
 On February 28, 1995, upon the consent of both parties, the district judge (now Circuit Judge Evans) transferred this case to the magistrate judge. 28 U.S.C. § 636. Although the Plaintiff's counsel appended the magistrate judge's opinion to her appellate brief, as is required under Fed.R.App.P. 30, this opinion simply states that: "[f]ollowing oral argument, and for the reasons stated on the record, the court found that the decision of the Commissioner is supported by substantial evidence." (Pl.'s App. at 2.) Counsel did not provide a transcript of these proceeding. Although we would prefer a more complete record of the magistrate's findings, we need not remand for development of the record [pursuant to Circuit Rule 50] because we can fairly resolve this case based on the administrative record. See Books v. Chater, 91 F.3d 972 (7th Cir.1996)
 
 
 [2]
 Plaintiff filed her SSI application on March 10, 1992. The ALJ issued a decision on February 22, 1994. Hence, the span of time between these dates is the relevant time period for purposes of determining Plaintiff's SSI eligibility
 
 
 [3]
 The regulations provide that the required level of severity (to support a "disabled" finding) for a Somatoform disorder is met the alleged impairment causes 1) a marked restriction of activities of daily living; or 2) marked difficulties in maintaining social functioning; or 3) deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or 4) repeated episodes of deterioration in work settings which cause the individual to withdraw from that setting or to experience exacerbation of signs and symptoms in such settings. See 20 C.F.R. Pt. 220, App. 1 § 12.07(B)