**Yoshica N. CHERRY, Plaintiff–Appellant,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant–Appellee.**

No. 00–1352.

United States Court of Appeals, Seventh Circuit.

Submitted Oct. 3, 2000.*

Decided Feb. 26, 2001.

---

* We granted a motion to waive oral argument in this case, and therefore the appeal is submitted on the briefs and the record.

Before Hon. FLAUM, Chief Judge, Hon. COFFEY and Hon. ILANA DIAMOND ROVNER, Circuit Judges.

### ORDER

Yoshica Cherry suffered an injury in December 1993 when crystals from a toilet bowl deodorant blew into her eyes. After an unsuccessful attempt to obtain supplemental security income and disability income benefits in January 1995, Cherry applied again in September 1995, alleging disability due to vision problems and eye pain. Cherry's applications were denied, and she subsequently sought review before an ALJ. After holding a hearing, at which Cherry and a vocational expert testified, the ALJ concluded that Cherry was not disabled because she retained the residual functional capacity (RFC) to perform a significant number of jobs in the national economy. A magistrate judge upheld the denial of benefits, and Cherry appeals, arguing that the ALJ erred in evaluating her RFC and her credibility. We affirm.

Cherry, age twenty-four at the time of the hearing, graduated from high school in 1989, has two small children, and has sporadically worked as a cashier and a waitress. Since the December 1993 injury, she has complained of symptoms such as photophobia, blurred vision, eye redness, and tearing.

Cherry began seeing Dr. Pepose, an eye specialist, in early September 1994. He diagnosed keratitis and prescribed topical steroids. Later that month, Dr. Pepose reported that Cherry had responded "dramatically" to the treatment. And by September 28, Cherry was "doing much better" and the keratitis was "almost" resolved. When Cherry returned on October 12, she had no symptoms and had discontinued use of her medications. Dr. Pepose reported that the keratitis was resolved.

Cherry saw Dr. Pepose again on November 16, complaining of redness, pain, photophobia, clear discharge, and a stinging sensation. Dr. Pepose diagnosed keratoconjunctivitis of an unknown origin. Cherry continued to complain of tearing and photophobia on November 28 and commented that a new medication prescribed by Dr. Pepose did not improve her condition. Dr. Pepose diagnosed superficial keratitis. From the end of January to the beginning of May, Dr. Pepose continued to treat Cherry for periodic flare-ups of keratitis. She did not see Dr. Pepose again until January 1996, when she told him that for the past seven months she had stayed indoors in dim light to prevent discomfort to her eyes. She had returned to work a week earlier as a cashier but could not tolerate the lights. Dr. Pepose diagnosed dry eye syndrome, keratitis, and chalazions. This was Cherry's last visit with Dr. Pepose.

Dr. Szewczyk, a consultative physician, examined Cherry in September 1996. He diagnosed keratitis of the right eye, unexplainable visual loss in the left eye, and an old chalazion on the right eye. Dr. Szewczyk also noted that Cherry's right cornea was studded with active lesions, causing right photophobia. As to the effect of Cherry's impairments on her ability to work, Dr. Szewczyk opined that her ability to lift, carry, stand, walk, or perform other postural activities remained unaffected, but that she should avoid climbing, moving machinery, and exposure to ocular irri-

tants such as chemicals, fumes, humidity, and dust.

At the hearing Cherry testified that she was unable to work because of blurred vision, sensitivity to light, and constant daily pain. She stated that her eyes did not focus for the first few hours in the morning and that her eyes swelled daily. Light caused pain by producing a burning sensation in her eyes, and the pain was worse in her right eye. According to Cherry, "any type of extra activity, strain or whatever" aggravated her condition.

As to her daily activities, Cherry testified that she mostly rested because the less she did, the better off she was later. She said that it was best for her to stay in the dark, and she often wore dark sunglasses. She did not read, take public transportation, or drive. Her mother and her sister cared for her children, cooked for her, shopped for her, and paid her bills. She was able to bathe and dress herself, do laundry, and go to restaurants.

James Israel, a vocational expert, also testified at the hearing and subsequently responded to interrogatories posed by the ALJ. The ALJ asked Israel whether there were any jobs available in the national economy for a person of Cherry's age, education, and work experience, that did not involve climbing, dangerous moving machinery, or exposure to fumes, humidity, dust, chemicals, or bright light. Israel responded that such a person could perform the position of retail sales clerk, order clerk, cashier, and packer.

The ALJ ultimately found Cherry not disabled. Applying the five-step sequential process, 20 C.F.R. §§ 404.1520, 416.920, the ALJ first found that Cherry had not engaged in substantial gainful activity since December 1993. At step two, the ALJ found that Cherry's impairments–active keratitis, a chalazion on the right eye, and vision loss in the left eye–were severe, but they did not meet or equal a listed impairment. Next, the ALJ determined that Cherry retained the RFC to perform sedentary to medium work that did not involve climbing, dangerous machinery, or exposure to chemicals, dust, fumes, humidity, or bright light. Lastly, the ALJ found that Cherry had no past relevant work but nevertheless could perform a significant number of jobs in the national economy consistent with her RFC.

■ Cherry first maintains that the ALJ's RFC assessment is not supported by substantial evidence because it should have included a restriction on low light, instead of bright light. Cherry, however, points to no medical evidence in support of this more restrictive limitation; indeed, no medical evidence supports the inclusion of any restriction on exposure to light. In assessing Cherry's RFC, the ALJ relied on Dr. Szewczyk's findings, and although Dr. Szewczyk found that the lesions on Cherry's right cornea caused photophobia, he did not identify any restriction on exposure to light. Nor did Dr. Pepose identify a restriction on exposure to light, and Cherry so acknowledges; when Cherry originally applied for benefits in January 1995, she wrote in her disability report that her treating physician had not restricted her activities, and she repeated that acknowledgment in a disability report filed in connection with her current applications. Despite the absence of medical evidence supporting a restriction on exposure to light, the ALJ nevertheless included a bright light restriction, apparently crediting Cherry's testimony that her eyes are sensitive to light. The record simply does not support Cherry's contention that the ALJ erred; therefore, she lacks any basis to contend further that the ALJ erred by not including a low light restriction in the hypothetical posed to the vocational expert. *See Herron v. Shalala*, 19

F.3d 329, 337 (7th Cir.1994) (hypothetical must set forth impairments to the extent supported by medical evidence in record).

Cherry next challenges a comment made by the ALJ regarding her credibility. Cherry points to the ALJ's statement that "[w]ith regard to credibility, the undersigned recognizes that [Cherry] may experience some degree of pain or discomfort at times of overexertion." Cherry says that the ALJ improperly discounted her subjective complaints of pain based on the misconception that her pain resulted from overexertion, not exposure to light. We disagree. The ALJ specifically acknowledged Cherry's testimony that light exacerbates her pain. If anything, the ALJ *credited* Cherry's testimony by including in her RFC a restriction on exposure to light, even though no medical evidence supported such a restriction. The ALJ's additional finding that overexertion also contributed to Cherry's pain is supported by her testimony; she said that "the less I do, the better off I am later, the less pain" and that her symptoms are aggravated by "any type of activity, strain or whatever."

■ Cherry also argues that the ALJ improperly considered her prior work history in assessing her credibility. Cherry takes issue with the following remarks in the ALJ's decision that seem to rely on her low earnings as a basis to discredit her complaints:

> With respect to the claimant's prior work record, the undersigned notes that the claimant has a poor work history, with minimal earnings even prior to the time she alleges disability, and frequent changes of employers.... An award of Supplemental Security Income Benefits alone at the full federal benefit rate would result in more annual income than she had in earned FICA income in all of her working years. That also could be a substantial inducement to allege disabl-

ing symptoms. An Administrative Law Judge may discount a claimant's subjective complaints if, among other reasons, she appeared to be motivated to qualify for disability benefits.

We agree with Cherry that the ALJ erred in discrediting her based on her prior work record. First, all claimants are motivated to qualify for disability benefits, so Cherry's desire to obtain benefits simply does not constitute a proper basis for discounting her credibility. Second, the ALJ failed to consider other factors that could have contributed to a poor work history, such as the alleged disabling condition itself, a lack of education, a lack of job opportunities, or transportation or child care obstacles. *See Sarchet v. Chater,* 78 F.3d 305, 308 (7th Cir.1996) (ALJ erred in discounting claimant's credibility based on work history where ALJ failed to consider claimant's minimal education, long list of medical ailments, and numerous medications); *Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir.1998) ("An ALJ should explore a claimant's prior work history to determine whether her absence from the workplace cannot be explained adequately (making appropriate a negative inference), or whether her absence is consistent with her claim of disability."). But here the assessment ultimately rests upon nothing more than a view that Cherry is incredible because she lacks significant prior income, and that view we refuse to endorse.

■ We nevertheless find these errors harmless because Cherry's work history played only a minor role in the ALJ's ultimate disability determination. The ALJ stated that "neither the objective medical evidence, nor the testimony of the claimant, establishes that her ability to function is so severely impaired as to preclude work." Based on this comment, we are persuaded that the ALJ credited most of Cherry's testimony, just not her conclu-

sion that her alleged disability precluded her from performing all work.

AFFIRMED.