Cynthia PAPPAS-SANAVAITIS, Plaintiff,

v.

Shirley S. CHATER, Commissioner of Social Security, Defendant.

No. 96 C 4566.

United States District Court, N.D. Illinois.

Sept. 12, 1997.

Michael J. Walkup, Palatine, IL, for Plaintiff.

Jack Donatelli, Assistant U.S. Attorney, Chicago, IL, for Commissioner.

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

The Plaintiff, Cynthia Pappas–Sanavaitis, seeks judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of a final decision of the Commissioner of Social Security (hereinafter "Commissioner")[1] denying her application for Disability Insurance Benefits. Plaintiff moves this Court for summary judgment reversing the Commissioner's decision denying her claim for such benefits or, in the alternative, an order remanding the case to the Commissioner for further proceedings. The Commissioner has filed a Cross–Motion for Summary Judgment in his favor. For the reasons set forth below, the Commissioner's Motion is denied and Plaintiff's Motion is granted in part; specifically, this cause is remanded to the Commissioner for further proceedings consistent with this Opinion.

### Procedural History

On June 7, 1994, Plaintiff filed an application for Disability Insurance Benefits, alleging that she had been unable to work because of disability since January 14, 1994. (R. at 48–51.) She described her disability as frequent headaches, fevers, lack of energy,

---

1. The Complaint names Shirley S. Chater, who was then the Commissioner of Social Security, as the Defendant herein. However, effective March 1, 1997, President Clinton appointed John J. Callahan as Acting Commissioner of Social Security, succeeding Commissioner Chater. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, John J. Callahan is substituted for Shirley S. Chater as the Defendant herein. No further action need be taken to continue this suit by reason of the last sentence of Section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

and pain in her back, hands, knees and ankles, all due to multiple sclerosis. (R. at 65.) The application was denied on September 29, 1994, (R. at 53–55), and, pursuant to Plaintiff's Request for Reconsideration of the denial, (R. at 58), the application was again denied on December 1, 1994. (R. at 60–62.)

On January 5, 1995, Plaintiff filed a Request for Hearing, (R. at 63), and, on April 20, 1995, a hearing was held before Administrative law Judge ("ALJ") Philip E. Wright. (R. at 162–187.) On August 28, 1995, the ALJ issued a decision, finding that Plaintiff was not disabled because she could still perform her past work as a general office worker. (R. at 23–34.) On September 11, 1995, Plaintiff filed a Request for Review of the ALJ's decision with the Appeals Council. (R. at 15.) On May 31, 1996, the Appeals Council denied the Request for Review of the ALJ's decision, (R. at 3–4), which decision stands as the final decision of the Commissioner, (R. at 3), and is the subject of the Cross–Motions now before the Court.

### Factual Background

#### A. Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified[2] that she was then 46 years old, having been born on August 1, 1948, and that she had a high school education. She has worked in the past performing general office clerical functions and also was a loan processor and loan officer for several banks and mortgage companies. (R. at 129, 166–168.) Those jobs were performed mostly while sitting. Because of her increasing inability to sit for long periods of time and the stress of the office work, Plaintiff quit that job and attempted to work for about two weeks in early 1995 as a waitress at a restaurant, which she did for only two and one-half hours per day, three days per week. She would come home after those two and one-half hours exhausted and with back pain. (R. at 168–169.) She quit that job on March 30,

1995. Prior to that two-week job, Plaintiff had last worked in January, 1994.

In describing her symptoms and their effects to the ALJ, Plaintiff testified that, after her diagnosis of multiple sclerosis, she was in denial for a couple of years and, instead of admitting to the disease, she was determined to persevere, overcome its effects, and continue to function. Plaintiff—through her husband—testified that she was unable to perform her job because of the prolonged sitting involved, which exacerbated the pain in her back which, in turn, caused muscle spasms, fatigue, mental stress and depression. (R. at 171.)

Plaintiff, who began weeping as she testified, testified that she has mood swings, which reduces her ability to concentrate and follow through on work-related activities. In the loan-processing job, after sitting for prolonged periods, she would be in such excruciating pain that she could not keep her mind on her work and would forget how to do routine things that she normally did every day. (R. at 174–175.) Specifically addressing her current depression, Plaintiff testified that her attention span wanders and that she becomes "preoccupied." (R. at 176.) Her physician has suggested that she take medication for her mood swings and depression, but she has declined to do so because of the many other medications she takes. (R. at 177–178.)

#### B. Medical Records

A Magnetic Resonance Imaging ("MRI") of Plaintiff's brain on July 2, 1990 first revealed findings consistent with multiple sclerosis ("MS"). (R. at 96.) On June 5, 1990, she had complained of numbness, which waxed and waned, in both hands. Plaintiff was encouraged to undergo a spinal fluid analysis, which she refused. (R. at 100–102.) On October 17, 1990, she complained of flu-like symptoms, a fever and back pain, for which anti-inflammatories were recommended. (R. at 101.) On November 14,

---

**2.** Actually, Plaintiff's testimony was minimal. Most of the *testimony* was given by James R. Sanavaitis, Plaintiff's husband, who described the problems Plaintiff complains of, the medications she takes and their effects on her and the problems she had on her jobs before she quit. It was Plaintiff's husband who first testified that Plaintiff suffers from mental stress and depression. Plaintiff then, at the urging of the ALJ, endorsed all of the symptoms described by her husband. (R. at 171–173; 174–177.)

1990, Plaintiff still complained of numbness in her hands. She also continued to complain of back pain and numbness in her legs and feet. (R. at 108–110.) On May 18, 1993, Neurologist Dr. Steven B. Wolf confirmed that Plaintiff has MS. (R. at 106–107.) Plaintiff quit work in January 1994, and filed the application herein on June 7, 1994.

On August 30, 1994, at the request of the Commissioner, Plaintiff underwent an internal medicine examination by Stephen S. Epner, M.D., who noted her diagnosis of MS. He noted her report of current tingling in her feet, knees, hands and fingers, and demonstrated decreased sensation in those extremities upon testing. Plaintiff also alleged that she became fatigued easily, had occasional vertigo, decreased vision and decreased memory and concentration to the extent that she sometimes became lost while driving. Objectively, Dr. Epner noted the decreased sensation in both feet and legs to above the knees, and in both hands and arms to the elbows. (R. at 111–115.)

On September 19, 1994, apparently based on Dr. Epner's August 30, 1994 report, Dr. F. Paul LaFata, a non-examining physician, completed a Residual Physical Functional Capacity Assessment form, opining that Plaintiff could lift from ten to twenty pounds, stand and/or walk about six hours in an eight-hour workday, and sit for up to six hours. While noting that Plaintiff had tingling sensations in her hands, he found that it had not been established that she would have any problems using her hands. (R. at 116–120.)

In a report dated March 24, 1995, Dr. Wolf noted that Plaintiff has pain when she sits for long periods of time, but that she has no limitations in lifting, standing, or walking. (R. at 124–126.)

On June 6, 1995, Plaintiff underwent a post-hearing neurological evaluation by Dr. Hien Dang, at the request of the Commissioner.[3] Plaintiff's complaints to Dr. Dang were the same as those voiced to Dr. Epner on August 30, 1994. Objectively, however, Dr. Dang found her to be neurologically in-

tact. He made no specific findings with respect to Plaintiff's mental status, except to note that she should be able to handle her own funds in her own best interests. (R. at 133–137.) With respect to Plaintiff's ability to do work-related activities, from a physical standpoint, Dr. Dang noted only her own statements as to her ability to sit, stand, walk, lift, etc. (R. at 138–139.) The foregoing constitutes all of the medical evidence on which the ALJ relied in reaching his decision.

On November 29, 1995 and December 6, 1995, at the request of counsel, who was retained after the ALJ had denied her application, Plaintiff underwent a psychological evaluation by Dr. Margo M. Jacquot, a clinical psychologist. Plaintiff was given a clinical interview, mental status examination, and a battery of psychological tests. Dr. Jacquot opined, based on the tests and the interview, that Plaintiff's "physical deterioration and emotional distress feed off one another and exacerbate both physical and psychological symptomatology. Resultantly [she] is wilting, and she feels little hope for recovery."

In the opinion of Dr. Jacquot, the combination of Plaintiff's physical state and psychological state jeopardizes her ability to carry out the more complex tasks of daily living. (R. at 141–145.) In assessing Plaintiff's mental ability to engage in work-related activities, in a work setting, Dr. Jacquot rated her as being "markedly limited" in the abilities to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attention and be punctual within customary tolerances. (R. at 146.) Plaintiff would be likely to "decompensate" under the stress of a competitive full-time job, because she would likely experience high levels of stress relating thereto. (R. at 151.) Finally, Dr. Jacquot opined that Plaintiff suffers from mental impairments, the severity of which meets the Commissioner's criterion for presumptive disability. (R. at 153–160.)

---

**3.** This evaluation was requested by the ALJ, who assured Plaintiff that he would order both neurological and psychological evaluations prior to issuing his decision. (R. at 179, 184.) No psychological evaluation was obtained, however.

## C. The ALJ's Findings

In his decision, the ALJ cited Plaintiff's testimony concerning her past work as a general office worker, loan processor, loan officer and waitress, and the reasons that she left those jobs. He noted that, with the exception of the waitressing job—which he found to be an unsuccessful work attempt— her past jobs were essentially sit-down jobs, requiring little lifting. The ALJ then noted Plaintiff's testimony regarding her mood swings, decreased concentration and slow thinking and that she was not taking any medications for the mood swings. (R. at 24–25.)

Next, the ALJ cited all of the medical evidence in the record, including the opinions of all examining and non-examining physicians relating to her impairments—both objective and subjective—and her ability to perform work-related functions. He noted that, when Dr. Dang examined Plaintiff after the hearing, he noted that her mood and affect were appropriate. (R. at 25–27.)

In analyzing the cited medical records, the ALJ concluded that Plaintiff has a diagnosis of a demyelinating disease, which is thought to be MS, and that she has "mild situational depression." He felt that these impairments were severe, in that they impose more than a minimal effect on her ability to function. However, he found that her impairments would not prevent her performance of her past work as a general office worker. In so finding, the ALJ discredited Plaintiff's testimony regarding the extent of her pain, mood swings, and depression to the extent that they would preclude her performance of her past work as a general office worker. The ALJ specifically noted, in this regard, that in June and November 1994, Plaintiff filled out forms regarding her daily activities in which she acknowledged that she maintained a home, reads as a hobby, took her young son out and had lunch with friends. She also reported driving a car, cooking, cleaning, dusting, washing laundry, shopping for groceries, dining out with her husband and watching movies at home. The ALJ found that the performance of such activities was inconsistent with Plaintiff's assertions that she could no longer perform her prior work. (R. at 28–29.)

With regard to Plaintiff's testimony concerning her mood swings and depression, the ALJ noted that she was not taking any medication for such problems, and that she had indicated that her "slow thinking" was due to the pain medication she was taking. He noted further that, when Plaintiff was given her internal medicine examination on August 30, 1994 by Dr. Epner, he noted that she did fairly well, except that she could remember only one out of three objects mentioned to her after five minutes. Moreover, when examined on June 6, 1995 by Dr. Dang, a neurologist, she was alert and oriented and her speech was normal. Finally, the ALJ noted that Plaintiff has never been treated for a mental disorder. (R. at 31–32.)

### Standard of Review

In reviewing the Commissioner's (here the ALJ's) decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). Rather, the court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (1988), where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron* 19 F.3d at 333 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Id.* Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir.1990). *See also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir.1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). The court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v.*

*Secretary of Health and Human Services,* 969 F.2d 534, 538 (7th Cir.1992).

■ This does not mean that the Commissioner (or ALJ) is entitled to unlimited judicial deference, however. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron,* 19 F.3d at 333; *see also Young v. Secretary of Health and Human Services,* 957 F.2d 386, 393 (7th Cir.1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala,* No. 93 C 323, 1994 WL 66102, *9 (N.D.Ill.1994) (ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that the full course of his decision may be discerned), (citing *Brown v. Bowen,* 847 F.2d 342, 346 (7th Cir.1988)).

The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (1994). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520 (1994); *see also Young,* 957 F.2d 386, 389. A finding of disability requires an affirmative answer at either step 3 or step 5. A negative answer at any step (other than step 3) precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4, after which the burden shifts to the Commissioner at step 5. *Id.* Here, the ALJ's analysis concluded at step 4, when he found that Plaintiff is able to perform her past work.

*Analysis*

■ Applying the standards set forth above to the facts of this case, the Court must conclude that the record with regard to Plaintiff's mental impairments is insufficient to support the ALJ's findings in that regard. Therefore, the Commissioner's final decision is not supported by substantial evidence.

At the outset, the Court notes the ALJ's careful recitation of and analysis of the evidence as it relates to Plaintiff's physical impairments, including her allegations of pain, and can find no fault with that analysis. However, having brought out, through his own questioning of Plaintiff, the possibility of the existence of mental impairments—especially in view of the fact that Plaintiff was represented by her husband, not an attorney [4]—it was incumbent upon the ALJ to complete the record in that regard. *See Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir.1991); *Sears v. Bowen,* 840 F.2d 394, 402 (7th Cir.1988). Indeed, the ALJ recognized his responsibility. After hearing Plaintiff's testimony regarding her multiple problems caused by MS, the ALJ stated as follows:

> MS, however, can also cause psychological problems and that's well recognized ... I'm required, in my job, to sit [here] and look at all the possibilities ... particularly if I believe testimony [that] there's evidence to indicate some of the manifestations might include psychological ... and that, I feel, is what the case is.

(R. at 183.)

The ALJ then went on to explain to Plaintiff that it was his (the ALJ's) responsibility to develop a complete record on which to base his determination, and that he would leave the record open and send her for consultative neurological and psychological evaluations before making that determination.

> As part of the psychologists [sic] evaluations, I may order some special studies done ... Particularly I'm curious about the concentration ability and your memory ability and some of the other things ... Once we get those records, ... maybe

---

4. In view of its findings herein, the Court finds it unnecessary to address Plaintiff's allegation that she did not effectively waive the assistance of counsel.

we'll get the file complete and I'll be able to make a decision.

(R. at 184.)

Notwithstanding his clear indication to Plaintiff that he felt, based on her testimony, that a psychological evaluation was warranted, and his assurances that he would obtain such evaluation and consider the findings thereof in his determination, the ALJ failed to do so. He did not explain in his decision why he decided not to do so. Instead, the ALJ relied heavily on the observations of Dr. Epner, during an internal medicine examination, that Plaintiff did fairly well on the "mental examination", except that she could remember only one out of three objects mentioned to her five minutes earlier. The report of Dr. Epner's mental status examination reveals that he asked her about the day, month, and year of the examination, which she answered correctly; asked her to recite five, one-digit numbers; asked her to name the President, Mayor and Governor; asked her to name five former presidents of the United States, etc. She did miss two out of the three objects mentioned to her after five minutes, the significance of which is not known. (R. at 114.) It is noted that, during the mental status examination administered by Dr. Dang, on which the ALJ also relied, she was asked some of the same questions asked by Dr. Epner, and her performance appears to have been worse than with Dr. Epner. (R. at 135.) Again, the significance of this performance is not known.

■ Although the ALJ devoted only one paragraph of his 12–page decision to discussing Plaintiff's alleged mental impairments before dismissing them based on the observations of two non-mental health professionals, (R. at 32), the Commissioner, in his brief, cited testimony from Plaintiff and her husband which he claims justifies the ALJ's findings. Defendant's Memorandum in Support of Commissioner's Motion for Summary Judgment ("Def's. Mem. in Supp.") at 10–11. However, since the ALJ did not indicate that he considered the cited testimony and other evidence not mentioned by him in his decision, the Court will not consider whether such other record evidence, along with that specifically cited by the ALJ, justified his decision regarding the severity of Plaintiff's alleged mental impairments. In determining whether the ALJ's decision is supported by substantial evidence, the Court has considered only the evidence that was mentioned, and therefore considered, by the ALJ.

Plaintiff asserts that the Appeals Council, in denying her request for review of the ALJ's decision without providing its rationale for determining that Dr. Jacquot's psychological evaluation did not provide a basis for changing the ALJ's decision, committed error. Plaintiff's Memorandum in Support of Motion for Summary Judgment or, in the Alternative, Remand ("Pl's. Mem. in Supp.") at 9; Plaintiff's Reply to Defendant's Memorandum in Support of Motion for Summary Judgment ("Pl's. Reply") at 4. In its denial of the request for review, the Appeals Council noted only that it had "considered" the evaluation of Dr. Jacquot and had concluded that it did not provide a basis for changing the ALJ's decision. It, therefore, denied the request for review and specifically noted that the *ALJ's* decision would stand as the final decision of the Commissioner. (R. at 3.)

■ The Commissioner's Regulations provide that the Appeals Council will grant a request for review where new and material evidence is submitted with the request for review. In such instances, the Appeals Council will evaluate the entire record, including the new and material evidence submitted,[5] if it finds that the ALJ's findings or conclusions are contrary to the weight of the

---

5. Here, the Appeals Council acknowledged its obligation to review new and material evidence submitted with the request for review and to grant the request if the new and material evidence, along with the other evidence of record, convinced it that the ALJ was wrong. (R. at 3.) Implicit in the Appeals Council's failure to grant review then is a finding that the "new" evidence was not "material." The Court cannot conclude that the Appeals Council's refusal to grant the request for review, which is discretionary, rested on a mistake of law. *Eads*, 983 F.2d at 817, citing *Nelson v. Bowen*, 855 F.2d 503, 506–508 (7th Cir.1988). Because of several noted inconsistencies and contradictions in Dr. Jacquot's evaluations, the Court does not find that, had the new evidence been submitted to the ALJ, he would more than likely have reached a different conclusion.

evidence then of record. 20 C.F.R. 404.970(b). When the Appeals Council *grants* a request for review and makes a decision on the merits, based on all the evidence before it, it is the decision of the Appeals Council (not the ALJ's decision) which becomes the final decision of the Commissioner and which is ripe for judicial review. *Ray v. Bowen,* 843 F.2d 998, 1001 (7th Cir.1988).

 The *denial* of the instant request for review by the Appeals Council is not subject to judicial review. The effect of such denial is that the *ALJ's* decision became the final decision of the Commissioner. *Damato v. Sullivan,* 945 F.2d 982, 988 (7th Cir.1991). The correctness of that decision, then, depends on the evidence that was before the ALJ. Since the report of Dr. Jacquot was not submitted to the ALJ and, therefore, was not considered by him in his determination, he could not have committed error by failing to consider it. *Eads v. Secretary of Health and Human Services,* 983 F.2d 815, 817 (7th Cir.1993). Likewise, the Court may not consider the post-decision submission of Dr. Jacquot's evaluation in its determination as to whether the Commissioner's decision is supported by substantial evidence. *Id.*

The ALJ's decision, which was based on the evidence before him, is problematic. Admittedly, there was not much in the record, prior to the hearing, to indicate the presence of a mental impairment—let alone a severe one—except Plaintiff's written statement, dated November 15, 1994, in which she stated that she quit her last job partially because she could not remain focused, would forget simple things, and could not concentrate. She also stated that sometimes, she would go to places, then wonder why she went there and how she got there. (R. at 82.)

At the hearing, the ALJ acknowledged that Plaintiff has MS, (R. at 185), that MS has many manifestations, both physical and mental, and that, after hearing her testimony, he was concerned enough about her alleged psychological manifestations that he would have her undergo a psychological evaluation to aid him in resolving that issue, since he apparently felt that he could not resolve it on his own. In his decision, howev-

er, the ALJ did not even attempt to explain why he later decided that he did not need the evaluation and opinion of a mental health professional to aid him in this regard. It does not appear that the post-hearing neurological evaluation by Dr. Dang—which is the only evidence which the ALJ had not reviewed at the time he conceded that he needed the aid of a psychological evaluation— would have caused the ALJ to change his mind in this regard. In fact, Plaintiff's performance on the "mental status examination" portion of that neurological evaluation appears to have been worse than noted by Dr. Epner in his internal medicine evaluation almost a year earlier.

 The Court does not suggest that Plaintiff's written descriptions and her testimony concerning her forgetfulness, depression, and lack of concentration necessarily warranted a psychological evaluation. That was for the ALJ to determine. However, having determined that Plaintiff's allegations were at least credible enough to warrant a psychological evaluation, and having assured her that he would obtain such an evaluation before ruling on her claim, the ALJ should have explicated more thoroughly his decision not to do so. While the post-decision psychological evaluation may not be considered in determining whether the ALJ's decision is supported by substantial evidence, it does indicate that, perhaps, the ALJ's initial decision to have Plaintiff undergo a psychological evaluation was warranted. Again, the accuracy of the report of Dr. Jacquot is questionable, as pointed out by the Commissioner in his brief. (Def's. Mem. in Supp. at 11–13.)

### *Conclusion*

 Prior to and at the hearing before the ALJ, Plaintiff presented some evidence that she may suffer from mental impairments. The ALJ acknowledged that Plaintiff's testimony in this regard was consistent—or at least not inconsistent—with the known symptoms of MS. The ALJ, therefore, assured Plaintiff that he would obtain a psychological evaluation from a mental health professional to aid him in his determination regarding her alleged mental problems. However, without obtaining such an evaluation, the ALJ deter-

mined that Plaintiff's alleged mental impairments are due to "situational depression", a medical diagnosis not found in the record. The ALJ did not explicate his rationale for initially deciding that he needed the assistance of a mental health professional to aid him in his determination in this regard, then deciding against doing so. The ALJ's decision, therefore, is not supported by substantial evidence. The ALJ's decision, however, is not so faulty that outright reversal is necessary. Indeed, it may well be that, upon proper development and analysis of the case—and even considering the psychological evaluation prepared by Dr. Jacquot—the ALJ's conclusion could be the same. In this regard, the Commissioner's observations may be well-taken. The Court is requiring only that the ALJ explicate his reasoning in arriving at his ultimate conclusion if he again finds that Plaintiff's alleged mental impairments would not preclude her performance of her past work. Plaintiff should be given another, less-abbreviated hearing, however. The ALJ may—but is not required to—have Plaintiff undergo another psychological or psychiatric evaluation and have a mental health professional testify at the next hearing in order to resolve any questions in this regard.