Juan ORTIZ, Plaintiff,

v.

Shirley S. CHATER, Commissioner of Social Security, Defendant.

No. 97 C 834.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 14, 1997.

David A. Bryant, Chicago, Il, for Plaintiff.

Sherri Thornton, U.S. Atty's Office, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

The Plaintiff, Juan Ortiz, seeks judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of a final decision of the Commissioner of Social Security (hereinafter "Commissioner")[1] denying his application for Disability Insurance Benefits. Plaintiff moves the Court for summary judgment reversing the Commissioner's decision denying his claim for such benefits or, in the alternative, an order remanding the case to the Commissioner for further proceedings. The Commissioner has filed a Cross-Motion for Summary Judgment in his favor. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is denied and the Commissioner's Cross-Motion for Summary Judgment is granted.

1. The Complaint names Shirley S. Chater, who was then the Commissioner of Social Security, as the Defendant herein. However, on September 29, 1997, Kenneth S. Apfel was appointed Commissioner of Social Security, succeeding Commissioner Chater. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel is substituted for Shirley S. Chater as the Defendant herein. No further action need be

### Procedural Background

On March 16, 1994, Plaintiff filed an Application for Disability Benefits, alleging that he had been unable to work because of a disability since February 24, 1992.[2] (R. at 62–64.) He alleged disability on the basis of a lower back injury sustained in February, 1992. (R. at 83.) On July 12, 1994, Plaintiff's application was denied. (R. at 66–70.) Pursuant to Plaintiff's Request for Reconsideration, (R. at 71), the application was again denied on October 21, 1994. (R. at 73–75.) On November 11, 1994, Plaintiff filed a Request for Hearing, (R. at 78–79), and, on December 12, 1995, a hearing was held before Administrative Law Judge ("ALJ") Carolyn Cozad Hughes. (R. at 24–61.) On January 15, 1996, the ALJ issued her decision, finding that Plaintiff was not disabled. (R. at 8–16.)

On March 15, 1996, Plaintiff filed a Request for Review of the ALJ's decision with the Commissioner's Appeals Council. (R. at 7.) On December 3, 1996, the Appeals Council denied Plaintiff's Request for Review, which action stands as the final decision of the Commissioner, (R. at 4–5), and which is the subject of the Cross-Motions now pending before the Court.

### Factual Background

A. *Plaintiff's Testimony*

At the December 12, 1995 hearing before the ALJ, Plaintiff—who testified through a Spanish interpreter—testified that he was then 46 years old, having been born on August 18, 1949, and that he completed four years of elementary school in Mexico. From 1979 to February 1992, he worked as a machine operator for a company that manufactured hydraulic jacks. He operated various machines that were used in the production process. The sitting, standing, walking, and lifting requirements of the jobs varied, depending on the machines to which he was

taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Plaintiff later amended the alleged date of onset of his disability to November 23, 1993. (R. at 29, 60.)

assigned. (R. at 31–38, 50, 87.) After his back injury in February 1992, Plaintiff was off work until October 1992, at which time he returned to work at the company on light duty, which he continued to do until he was laid off on January 5, 1993, due to a reduction in force. (R. at 29, 32–34, 38, 83, 91, 255.) While on light duty, Plaintiff was assigned jobs in which he could sit or stand, at will, and in which he did not have to do any lifting. (R. at 34, 50.)

In describing his medical problems, Plaintiff testified that he has had pain in his lower back since his February 1992 injury. He has the pain all the time but, about two or three times a week, it is severe. The pain is especially severe when he first gets up in the morning and when he does a lot of bending. Dr. Goldflies is his treating physician, but prior to two weeks before the hearing, he had not seen Dr. Goldflies within the eight-month period prior to the hearing because he does not have money to pay him. Dr. Goldflies has not recommended surgery, but has told Plaintiff that his condition will improve with the passage of time. (R. at 51–52.) Plaintiff takes over-the-counter Tylenol two or three times a day, which affords some relief, but not much. (R. at 39–42.)

Plaintiff testified that he is able to walk about two blocks, but then has to stop and massage himself. He can stand, in one place, for 15 to 20 minutes, then must sit for 20 to 30 minutes. He then has to stand again, cannot bend, and believes that he can lift only about five to ten pounds. (R. at 42–43.) In describing his daily activities, Plaintiff testified that he gets up every morning at around 8:00 a.m. and looks for work every day, but that he does nothing in or around the house. He does drive his children to school, however. (R. at 42–46.)

Plaintiff's wife, Sylvia Ortiz, also testified briefly. She testified that she works as a manager of a restaurant, with flexible hours. She verified that Plaintiff does nothing around the house—she does everything—but that he does go out often looking for jobs. She feels that his condition has worsened since November 1993 and that he is unable to do the plumbing, electrical, and carpentry work that he used to do prior to his injury. (R. at 52–54.)

### B. Testimony of Vocational Expert

After hearing the testimony of Plaintiff and his wife, the ALJ examined Meyer Klein, an impartial vocational expert, concerning Plaintiff's vocational outlook considering the restrictions which she felt were supported by Plaintiff's testimony and the record. Plaintiff's attorney declined to ask any questions of the vocational expert. (R. at 60.) Mr. Klein testified that, considering Plaintiff's age of 46, lack of education, minimal fluency in English and his past work history of 14 years as a machine operator, there are jobs which he can perform, even if he has some difficulties with concentration, is unable to bend, stoop or kneel, and needs to be able to change positions every hour. (R. at 55–57.) With these restrictions, Mr. Klein testified that there are approximately 3,000 assembly jobs, 2,500 inspecting jobs and 1,500 parking jobs in the nine-county region around Chicago that Plaintiff could perform. (R. at 58.)

Mr. Klein testified further that if Plaintiff were able to lift up to 20 pounds, could stand for only 30 minutes at a time before sitting down, and needed to be able to stand after sitting for an hour, he would be relegated to sedentary jobs, of which there are approximately 2,000 assembly jobs, 1,000 parking jobs and 500 inspecting jobs in the same regional area. (R. at 58–59.) Finally, Mr. Klein testified, if Plaintiff had the same restrictions set forth above, with the exception that he could lift only five pounds, the assembly jobs would be reduced to approximately 1,000, and the parking and inspecting jobs would be reduced to approximately 500 each. (R. at 59–60.)

### C. Vocational Assessment by Vocational Counselor

On November 1, 1993, at the request of his worker's compensation attorney, Plaintiff underwent a Diagnostic Vocational Assessment by Cheryl R. Hoiseth, a vocational counselor. This was accomplished by interviewing Plaintiff regarding his work history and descriptions of the jobs he has performed and by entering that information into a computer for

analysis. Plaintiff's descriptions of his past jobs were compared against job titles, descriptions and significant vocational characteristics of more than 12,000 jobs as they are commonly performed in the economy. Information concerning Plaintiff's medical history and restrictions, as well as his ability to perform reading and arithmetic computations and his lack of ability to communicate effectively in the English language also were considered.

Ms. Hoiseth noted that Dr. Goldflies had limited Plaintiff to lifting no more than 20 pounds and that he should not engage in bending, stooping or kneeling activities. She also noted Plaintiff's statement that he could sit for thirty minutes at a time and stand/walk for thirty minutes at a time. She noted that even sedentary work requires the ability to sit for six hours out of a typical eight-hour work day. Therefore, she opined, Plaintiff would require a job in which he would basically sit down, but in which he could stand and move around at will during the work day. Because Plaintiff would also be preoccupied with positioning himself to avoid pain throughout the day, in her opinion, Ms. Hoiseth opined that Plaintiff's ability to concentrate on the task at hand would be compromised in any job. (R. at 150–161.) Finding that Plaintiff, "appears to be functionally illiterate and unable to communicate effectively in English", (R. at 156),[3] Ms. Hoiseth opined that he is at a "distinct disadvantage" in the competitive employment market. (R. at 155.)

### D. *Medical Records*

Plaintiff's medical records begin on December 30, 1991, when he reported to the Eastbrook Medical Center complaining of numbness in his back as a result of an alleged on-the-job injury on December 26, 1991. He was prescribed pain medication and advised not to lift more than 20 pounds. (R. at 257–263.) On February 3, 1992, Plaintiff was seen, at the request of the company's worker's compensation insurance carrier, by

Dr. James Ryan for an orthopedic evaluation. Plaintiff reported that he had suffered an on-the-job injury to his back on December 26, 1991. He was seen again by Dr. Ryan on March 11, 1992, June 10, 1992, and October 11, 1993. Dr. Ryan noted that Plaintiff's MRI revealed multiple bulging discs and degenerative disease, but opined that he could return to work at his regular job. (R. at 245–254.)

On March 10, 1992, Plaintiff was examined by Dr. James C. Cohen. He told Dr. Cohen that he had injured his back while lifting an approximately 50-pound tool on February 17, 1992. Then, on March 10, 1992, the date of the examination, Plaintiff's leg gave out while he was climbing stairs and he twisted his right ankle. Plaintiff made monthly visits to Dr. Cohen and Dr. Charles Slack from March through October 1992. He was diagnosed as having a bulging or herniated disc and radiating pain and was prescribed medications for pain. (R. at 228–237.)[4] Dr. Slack referred Plaintiff to an eight-week work-hardening program, after which it was concluded that he could not return to his prior job but that he could perform other jobs. (R. at 296–325.)

Plaintiff first saw Dr. Mitchell Goldflies on April 21, 1992, (R. at 162), and was seen, on about a monthly basis, from October 1992 through May 11, 1995. (R. at 164–208, 210–215.) He was seen again on October 24, 1995. (R. at 209.)[5] During his visits to Dr. Goldflies, Plaintiff was treated mostly with moist hot packs, soft tissue massages, stretching exercises and spinal manipulations. He would complain of back pain and stiffness during almost every visit, but on some occasions, he reported improvement. He was also urged to engage in a home exercise program, but he did not adhere to it very often because of stiffness. (R. at 46–47.) On August 31, 1993, Dr. Goldflies released Plaintiff to return to work on light

---

3.  Ms. Hoiseth noted that Plaintiff's wife served as an interpreter, on occasion, during the interview. Plaintiff indicated that he understands some English, but that, "he considers himself to be primarily Spanish-speaking." (R. at 150.)

4.  These visits also were in connection with Plaintiff's worker's compensation claim. (R. at 29.)

5.  These visits also were in connection with the worker's compensation claim. (R. at 39–40.)

duty, lifting no more than 20 pounds. (R. at 278.) [6]

On October 7, 1993, at the request of the worker's compensation insurance carrier, Plaintiff was given an orthopedic reevaluation by Dr. Ryan. Dr. Ryan noted that, during the examination, Plaintiff did complain of some pain. He opined that Plaintiff certainly could work, but that he should not lift more than 50 pounds. (R. at 252–254.) Then, less than one month later, on November 4, 1993, Plaintiff was examined, at the request of his worker's compensation attorney, by Dr. Jeffrey Coe. Dr. Coe reviewed Plaintiff's medical history since February 1992, reviewed an x-ray and MRI scan, examined Plaintiff and opined that he was permanently and totally disabled. (R. at 238–244.)

On May 25, 1995, Plaintiff underwent a physical examination by Dr. Joel M. Press, who found that he exhibited pain behavior with almost any motion, whether sitting or standing. While expressing his belief that Plaintiff had a great deal of pain, Dr. Press expressed some doubts as to whether the amount of pain exhibited could be accounted for based on the objective findings. (R. at 255–256.)

### E. *The ALJ's Findings*

In her January 15, 1996 decision, the ALJ conceded that Plaintiff's back problems are "severe" within the meaning of the Commissioner's regulations, but found that he still retained the ability to perform work in which he would not be required to lift or carry more than five pounds, that would not involve bending and stooping, and that would allow him to change positions while he worked. (R. at 11, 15.) The ALJ acknowledged that the restrictions imposed upon Plaintiff would prevent him from performing his past work as a machine operator, but, relying on the testimony of the vocational expert, found that there are other jobs that he can perform despite those restrictions. Therefore, the ALJ found that Plaintiff was not disabled.

The ALJ cited much of the medical evidence set forth above, including the objective findings on examination by Plaintiff's treating physicians and consultative physicians, noting that his testimony regarding the severity of his pain and its effects on his ability to perform work-related functions was inconsistent with the objective medical findings by the examining physicians. The ALJ noted that Plaintiff did return to work in October 1992, and worked until January 1993, at which time he was laid off—not because he was unable to perform the work, but because of a reduction in the work force.

### Standard of Review

In reviewing the Commissioner's (here the ALJ's) decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). Rather, the court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (1988), where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron* 19 F.3d at 333 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his/her ultimate conclusion. *Id.* Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir.1990). *See also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir.1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he/she finds more credible). This Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Services,* 969 F.2d 534, 538 (7th Cir.1992).

---

**6.** It appears that Plaintiff saw only Dr. Goldflies in 1994, and that his restrictions to light or sedentary work remained through October 24, 1995, which was the last time he saw Dr. Goldflies prior to the December 12, 1995 hearing before the ALJ. (R. at 182–209.)

■ This does not mean that the Commissioner (or ALJ) is entitled to unlimited judicial deference, however. In addition to relying on substantial evidence, the ALJ must articulate his/her analysis at some minimal level and state his/her reasons for accepting or rejecting "entire lines of evidence," although he/she need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also Young v. Secretary of Health and Human Services*, 957 F.2d 386, 393 (7th Cir.1992) (ALJ must articulate his/her reason for rejecting evidence "within reasonable limits" in order for meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D.Ill.1994) (ALJ need not spell out every step in his/her reasoning, provided he/she has given sufficient direction that the full course of his/her decision may be discerned), (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir.1988)).

■ The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (1994). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.; see also Young*, 957 F.2d 386, 389. A finding of disability requires an affirmative answer at either step 3 or step 5. A negative answer at any step (other than step 3) precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4, after which the burden shifts to the Commissioner at step 5. *Id.*

In the instant case, the ALJ found that the Plaintiff satisfied his burden of proof as to steps 1, 2, and 4. The ALJ also found, at step 3, that Plaintiff failed to demonstrate any impairment that met or equalled the requirements in the listing.

Moving to step 5, the ALJ found that Plaintiff was capable of performing work which exists in significant numbers in the national economy. The ALJ's analysis at step 5 typically involves an evaluation of the claimant's Residual Functional Capacity ("RFC") to perform a particular category of work (*i.e.* sedentary, light, medium, heavy or very heavy work), in combination with an application of the Medical–Vocational Guidelines ("the Grid") to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1994).

■ The Grid is a chart which classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987). The Grid was promulgated to simplify the process, and improve the consistency, of disability determinations. *Id.* If the use of the Grid is appropriate, the Commissioner may rely upon it for determining disability, and, in such a case, the Grid alone constitutes substantial evidence sufficient to uphold the decision of the Commissioner. *Id.* However, use of the Grid may be inappropriate if the claimant suffers from severe non-exertional impairments which prevent the claimant from performing the work indicated by the Grid. *Id.* at 640–41. Thus, if non-exertional impairments are severe enough, use of the Grid is not appropriate and the courts will reverse a determination of non-disability based on the Grid. *Id.* at 641.

■ The determination as to whether use of the Grid is appropriate is a question of fact, and the ALJ's use of the Grid will be upheld if substantial evidence supports its application. *Walker*, 834 F.2d at 641. The fact that a claimant suffers from a non-exertional impairment does not automatically preclude utilization of the Grid; in such a case, the ALJ must determine whether the claimant's non-exertional impairments are severe enough to substantially limit the claimant's abilities. *Id.* "To uphold the ALJ's finding that grids may be used in a given case, we require only 'that there be reliable evidence

of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available.'" *Id.* (citing, *Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir.1986).)

### Discussion

Finding that Plaintiff is unable to lift or carry more than five pounds, that he should not perform work which requires him to bend or stoop, and that he should be allowed to change positions occasionally while working, the ALJ found that he is relegated to the performance of sedentary work.[7] Noting that Plaintiff was then 46 years old and illiterate in English, and that his past work was classified as "semiskilled", but that he had not acquired any skills that could be transferred to sedentary work, the ALJ opined that neither Grid Rule 201.17, which would direct a finding of "disabled", nor Grid Rule 201.19, which would direct a finding of "not disabled", should be applied. Instead, she used those rules as a framework for her decision, as authorized by 20 C.F.R. pt. 404, subpt. P, app. 2, Section 200.00(d) (1994), and, pursuant to 20 C.F.R. 404.1566(e), had a vocational expert testify at the hearing. The vocational expert testified that there are a significant number of jobs in the economy that Plaintiff can perform. The vocational expert testified that there are approximately 2,000 jobs in the Chicago metropolitan area that Plaintiff can perform, even with the restrictions found by the ALJ. (R. at 60.) The ALJ cited these jobs in finding that Plaintiff is not disabled. (R. at 14.)

The ALJ found that Plaintiff could not perform a full range of sedentary work because of her finding that he could not lift more than five pounds, his need to avoid bending and stooping and his need to be able to change positions occasionally. (R. at 15.) Because of these further limitations on performing sedentary work, the ALJ found that use of the Grid was inappropriate, since Plaintiff's specific vocational profile is not covered by the Grid. It was the ALJ's finding that Plaintiff could not perform a full range of sedentary work—a finding which was favorable to Plaintiff and with which Plaintiff agrees—which caused the ALJ not to rely on the Grid and which necessitated the testimony of the vocational expert. The vocational expert's testimony was not favorable to Plaintiff.

■ However, Plaintiff now argues that the ALJ committed error by *not* using the Grid,[8] since its use would have been to Plaintiff's advantage. Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl's. Mem. in Supp.") at 3–4; Plaintiff's Answer to Defendant's Counter–Motion for Summary Judgment ("Pl's. Answer to Counter–Motion").[9] In this regard, Plaintiff cites two examples set forth in Section 201.00(h) of 20 C.F.R. pt. 404, subpt. P, app. 2, ("Section 201.00(h)") in which hypothetical individuals who cannot perform the full range of sedentary work—though younger individuals— may be found disabled. Neither of these examples is applicable here. The second example cited in Section 201.00(h), and the one urged by Plaintiff, involves a younger, illiterate, mildly mentally-retarded individual,

---

7. From May 1993 through August 1994, Dr. Goldflies, Plaintiff's treating physician, consistently opined that Plaintiff could lift from 20 to 30 pounds and should avoid bending and stooping and that he should be re-trained for jobs within those restrictions. (R. at 175–198.) Then, on one occasion—February 16, 1995—Dr. Goldflies opined that Plaintiff should lift no more than *five* pounds and that he should continue to seek work within that limitation. (R. at 204.) The Court assumes that the ALJ made her ultimate concession, that Plaintiff could not lift more than five pounds, (R. at 11, 15), based on the February 16, 1995 letter from Dr. Goldflies, since that letter, and Plaintiff's testimony, (R. at 43), are the only indications in the record from which such a conclusion could be drawn.

8. Had Plaintiff been able to perform the full range of sedentary work, the ALJ would have had to apply Grid Rule 201.19, which mandates a finding of "not disabled." Plaintiff does not argue that the ALJ should have used that rule. On the other hand, Grid Rule 201.17, the application of which would have achieved Plaintiff's desired results, would have been inappropriate, since his past work was not "unskilled." Rather, Plaintiff argues for application of 20 C.F.R. pt. 404, subpt. P, app. 2, Section 201.00(h).

9. Plaintiff failed to number the pages of his answer to the Counter–Motion. However, the Court did review and consider that pleading.

whose past work consisted of unskilled agricultural field work, which he can no longer perform, and who is now unable to perform the full range of sedentary work. Because of the adverse factors (illiteracy, with mild mental retardation, and an unskilled prior work background) which further narrow the range of sedentary work for which such an individual is qualified, a finding of "disabled" would be "appropriate."[10] Apparently because of Plaintiff's complaints of pain and the limitations caused thereby, along with her finding that he could not lift more than five pounds— which is less than the minimum exertional level for sedentary work—the ALJ decided that use of the Grid in this case was inappropriate. The determination as to whether use of the Grid is appropriate in a given case is itself a question of fact, and such determination will be upheld so long as substantial evidence supports that determination. *Walker v. Bowen*, 834 F.2d at 641. There is no requirement that an ALJ's decision to apply or not apply the Grid be determined by which decision would be most favorable to a claimant. Moreover, as set forth above, had the ALJ chosen to apply a Grid rule, the most appropriate rule would have been Rule 201.19, since both the vocational expert at the hearing and Ms. Hoiseth agree that Plaintiff's past relevant work was semiskilled, rather than unskilled, and Ms. Hoiseth states that he acquired no skills that would be transferable to other work. (R. at 56, 154.) Had the ALJ applied this rule, which mandates a finding of "not disabled", she would have committed reversible error because of her finding that Plaintiff cannot perform the full range of sedentary work because he can lift only five pounds, cannot bend or stoop, and because of his need to change positions occasionally. Accordingly, the Court concludes that the ALJ's decision not to apply the Grid or Section 201.00(h) but, instead, to utilize the testimony of a vocational expert, is supported by substantial evidence. Therefore, her decision in this regard is upheld.

Plaintiff contends that the ALJ's reliance on the vocational expert's testimony—which was elicited by posing three hypothetical questions—that there are 2,000 jobs which are "available" to Plaintiff was erroneous. In this regard, Plaintiff asserts that the factual basis for the vocational expert's opinion does not fit the actual facts ultimately found by the ALJ. Pl's. Mem. in Supp. at 3. In her "findings", the ALJ found that Plaintiff is "considered to be illiterate in English for purposes of this decision." (R. at 15.) In posing her hypothetical questions to the vocational expert, however, she asked him to assume that Plaintiff "speaks and understands some functional English but is not fluent." (R. at 57.)[11] Plaintiff testified that he speaks and understands "a little bit" of English, (R. at 32), and Ms. Hoiseth found that he understands some English but, "considers himself to be primarily Spanish-speaking." (R. at 150.) For purposes of her analysis, however, Ms. Hoiseth found that Plaintiff, "appears to be functionally illiterate and unable to communicate effectively in English." (R. at 156.) Carol Solander Barnes, who was Plaintiff's Vocational Rehabilitation Counselor, states that he, "does speak functional English", (R. at 285, 287–288, 290), although he does not read or write, (R. at 284).

By all accounts, including Plaintiff's testimony, he is able to communicate in English, although the effectiveness thereof is questionable. Considering the testimony of Plaintiff and the reports of Ms. Hoiseth and Ms. Barnes, the ALJ's direction to the vocational expert that he assume that Plaintiff

---

10. The Court notes that, while Plaintiff has been found to be functionally illiterate and unable to communicate effectively in English, there has been no finding that he is mentally retarded and his past work was semiskilled, rather than unskilled agricultural field work, as set forth in example 2. Therefore, the examples set forth in Section 201.00(h) are inapplicable. *See Nix v. Sullivan*, 744 F.Supp. 855, 863 (N.D.Ind.1990), aff'd, 936 F.2d 575 (7th Cir.1991).

11. Illiteracy is defined as the "inability to read or write." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 1983 at 599. Plaintiff appears to argue that the ALJ's findings that he is illiterate in English and her hypothetical question in which she finds that he understands some functional English, but is not fluent therein, are inconsistent findings. Pl's. Answer to Counter–Motion. The Court finds that the findings are not inconsistent and that both findings are supported by substantial evidence.

speaks and understands some functional English, but that he is not fluent therein, is supported by the record. Her finding that Plaintiff is illiterate—unable to read and write—in English is also supported by the record.[12]

■ Careful review of the record reveals that the ALJ's final hypothetical was of a 46–year–old individual with a fourth-grade education; who speaks and understands some functional English but is not fluent therein; who has the same semi-skilled past work history as Plaintiff; who can lift and carry no more than five pounds; who cannot bend or stoop; who has some difficulties with concentration, so that he is unable to perform jobs that require more than moderate levels of concentration; and who would need to be able to change positions occasionally. The vocational expert, in citing the 2,000 jobs that such an individual could perform, interpreted the term "occasionally", as used by the ALJ, as the ability to change positions every 30 to 45 minutes. (R. at 57–60.) The part of the hypothetical question relating to the ability to sit for one hour before needing to change positions, and the ability to perform light work, clearly related to the first and second hypotheticals, neither of which the ALJ accepted. (R. at 57–58.) Moreover, the ALJ specifically rejected Plaintiff's testimony that he needs to change positions every hour. (R. at 13.)[13] Therefore, the ALJ's decision in this regard is supported by substantial evidence in the record.

Plaintiff asserts that, had the ALJ included in the hypothetical the fact that he is illiterate in English, this would have eroded the job numbers produced by the vocational expert. Pl's. Answer to Counter–Motion. He then goes on to cite a job title listed in the U.S. Department of Labor's *Dictionary of Occupational Titles* ("DOT") and the description thereof, and argues that the reading, writing and speaking requirements of that job title are beyond his capabilities. With respect to the other two job titles— assembly and inspection work—Plaintiff emphasizes that the vocational expert used the words "assembly work" and "inspecting work" and argues that these are "areas" of work, not jobs. Plaintiff then cites many job titles listed in the DOT and wonders whether the vocational expert was referring to these jobs in his testimony. He asserts that, had the vocational expert cited any of these specific jobs, Plaintiff could have shown that he was unable to perform any of them. Pl's. Answer to Counter–Motion. Without engaging in semantical exercises regarding job "titles" and "areas" of work, the Court notes that Plaintiff was represented by counsel at the hearing and that, when offered an opportunity to cross-examine the vocational expert regarding these matters, counsel declined to do so. (R. at 60.)

In articulating her reasons for discrediting Plaintiff's testimony regarding the limitations placed on him by his back problems, the ALJ noted that two examining physicians had indicated that Plaintiff appeared to exaggerate his symptoms during their examinations, and that there were some questions as to his

12. Based on the record, the ALJ could have formulated a hypothetical question in which Plaintiff has a fourth-grade education, which he obtained in Mexico, and is unable to read and write in English, but is able to speak and understand English, although he is not fluent therein. Such expanded hypothetical also would have been supported by the record. The only factor missing from the ALJ's hypothetical to the vocational expert is Plaintiff's inability to read and write in English. Ms. Hoiseth noted that Plaintiff learned to operate several different machines during his 14–year employment history with his employer, despite his inability to read and write. Moreover, Ms. Hoiseth agrees that there are approximately 2,700 jobs at the sedentary level which Plaintiff could perform if they did not require the ability to sit or stand at will. (R. at 154–157.)

13. Ms. Hoiseth, in concluding that Plaintiff, "is at a distinct disadvantage in the competitive employment market", (R. at 155), and in seemingly concluding that there are not a significant number of jobs in the economy which he can perform, based her opinions partially on an assumption which the ALJ specifically rejected. Thus, based on Plaintiff's statement to her and her interpretation of Dr. Goldflies' reports, Ms. Hoiseth assumed that Plaintiff has to change positions every 30 minutes and that, therefore, he would require a job in which he would be able to sit or stand at will. (R. at 155–157.) The *problems* with that assumption are that, nowhere in his notes does Dr. Goldflies even suggest such a restriction, and the ALJ specifically rejected Plaintiff's testimony in this regard. (R. at 13.)

motivation to work. (R. at 13, 284–294.) The ALJ noted Plaintiff's testimony and reports that he basically does nothing at home, and that he even needs assistance in dressing. She noted further, however, that Plaintiff returned to work after his initial injury, and that he was able to work—albeit at a lighter job—until he was laid off for non-medical reasons. (R. at 13.) The Court notes in this regard that, of all the doctors who have examined Plaintiff—whether at the request of his worker's compensation carrier, his worker's compensation attorney or the Commissioner—none has opined that he is unable to perform any work whatsoever. The only arguable exception is Dr. Coe, who examined Plaintiff once, at the request of his worker's compensation attorney, and concluded that, "he would be unlikely to find employment in the current labor marketplace" . . . and that "[he] is permanently and totally disabled for industrial purposes." (R. at 244.) This opinion, by a non-treating physician, was inconsistent with that of Dr. Goldflies, Plaintiff's treating physician.

The Court also notes the testimony of Plaintiff and his wife, as well as notations in Plaintiff's medical records, that he seeks work on almost a daily basis and that he can work in an appropriate job. (R. at 39, 44.) Dr. Goldflies, Plaintiff's primary treating physician, has not precluded him from all work and, with the exception of the February 16, 1995 letter, has opined that he can lift from 20 to 30 pounds, but that he should avoid bending and stooping.[14] Finally, the medical records do not indicate that Plaintiff's condition has deteriorated since his lay-off, to the extent that he is now unable to even dress himself. The ALJ properly discredited Plaintiff's assertions in this regard. (R. at 13.)

Finally, Plaintiff asserts that, even accepting the vocational expert's testimony that there are 2,000 jobs in the Chicago regional economy which Plaintiff can perform, that number is not a "significant" number, considering the total population of the area. Pl's. Mem. in Supp. at 4, Pl's. Answer to Counter-Motion. In support of this argument, Plaintiff cites *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir.1993), wherein the Seventh Circuit found that 1,400 jobs in the Milwaukee, Wisconsin area constituted a significant number of jobs. Asserting that the Milwaukee area then had a total job market of 750,000 and that the Chicago job market to which the vocational expert referred has a total job market of 6,500,000,[15] Plaintiff predicts that the Seventh Circuit would not find the existence of less than 12,133 jobs in the Chicago area to be significant. Pl's. Mem. in Supp. at 4, Pl's. Answer to Counter-Motion.

■ The Court notes that, in *Lee,* the Seventh Circuit cited several cases from other circuits in which it was found that between 174 jobs and 1,350 jobs constituted significant numbers. More importantly, however, the *Lee* court cited *Nix v. Sullivan,* 744 F.Supp. at 863, in which the district court found the existence of 675 jobs to be a significant number of jobs in a regional area, and which it affirmed. *Lee,* 988 F.2d at 794. Accordingly, the Court finds that the 2,000 jobs to which the vocational expert testified constitute a significant number of jobs.

### Conclusion

For the reasons set forth above, the Court finds that the Commissioner's decision that Plaintiff, despite his severe impairments, retains the residual functional capacity to perform a significant number of jobs which exist in the regional economy and is, therefore, not disabled, is supported by substantial evidence in the record.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment be, and the same hereby is, **denied.**

---

**14.** Plaintiff asserts that the ALJ erred in giving greater credence to the opinions of "insurance" doctors than to those of Dr. Goldflies, his treating physician. Pl's. Mem. in Supp. at 6.; Pl's. Answer to Counter-Motion. However, the ALJ, while noting that the physicians were nearly unanimous in their opinions that Plaintiff could perform at least light work, gave Plaintiff the benefit of any doubt and credited the February 16, 1995 report of Dr. Goldflies that he could lift only five pounds. (R. at 12.) While this concession is questionable, in view of all the other evidence of record, as set forth above, the Court will not second-guess the ALJ in this regard, since such finding is favorable to Plaintiff.

**15.** The basis for these figures is not shown.

IT IS FURTHER ORDERED that the Commissioner's Cross–Motion for Summary Judgment be, and the same hereby is, **granted.**